Centre County Lime Company, Appellant, *v.* P. S. C. et al. (No. 1.)

180

Argued March 9, 1931.

Before TREXLER, P. J., KELLER, LINN, GAWTHROP, CUNNINGHAM, BALDRIGE and DREW, JJ.

*James C. Furst,* for appellant, cited: New York & Pennsylvania Co. v. New York Cent. R. Co., 267 Pa. 64; Centre County Lime Co. v. Public Service Com. of Pa., 96 Pa. Superior Ct. 590.

*Henry Wolf Bikle,* and with him *William F. Zearfaus,* for intervening appellees.—A finding of unreasonableness as to rates for the future does not re-

quire a similar finding as to the same rates in the past: Baer Bros. v. D. & R. G. R. R., 233 U. S. 479; L. & N. R. R. v. Sloss-Sheffield Steel & Iron Co., 269 U. S. 217; Greensburg Borough v. Public Service Commission, 268 Pa. 177.

Nothing can be done toward redressing of wrongs suffered through the exaction of unreasonable rates until the commission shall have determined that the rates which were collected were unreasonable: Centre County Lime Company v. P. S. C., 96 Pa. Superior Ct. 590; New York & Pennsylvania Co. v. N. Y. C. R. R., 267 Pa. 64.

*Daniel H. Kunkel*, Legal Assistant, and with him *E. Everett Mather, Jr.*, Assistant Counsel, and *John Fox Weiss*, Counsel, for appellees.—Evidence of damages sustained by complainant is not admissible on a complaint seeking a finding that rates have been unreasonable in the past: New York & Penna. Company v. N. Y. C. R. R. Co., 267 Pa. 64; Alan Wood I. & S. Co. v. Public Service Commission, 97 Pa. Superior Ct. 1.

A finding that existing rates are unreasonable, upon which the maximum future rates have been prescribed, is not conclusive of the unreasonableness of the same rates in the past as a basis for subsequent reparation: Alpha Portland Cement Company v. Public Service Commission, 84 Pa. Superior Ct. 255.

OPINION BY CUNNINGHAM, J., July 8, 1931:

The question involved upon this appeal is whether an order of the Public Service Commission—refusing reparation to Centre County Lime Company, the appellant, for damages it claims to have sustained in consequence of the collection from it by Bellefonte Central Railroad, Pennsylvania Railroad and other carriers, of alleged unreasonable rates for the transportation

of certain commodities to and from its plant—was reasonable and in conformity with law. The making of the order, in the exercise of the powers conferred upon the commission by Section 5 of Article V of the Public Service Company Law approved July 26, 1913, P. L. 1374, is prima facie evidence of its reasonableness and the burden of proving the contrary is upon appellant. The complaint under which appellant sought reparation was filed August 13, 1928, at Complaint Docket No. 7790, and the order appealed from was entered September 23, 1930. A statement of some material and undisputed facts with a summary of the proceedings is essential to an understanding of the question now involved.

The plant of appellant is located at Lime Centre on the Bellefonte Central Railroad, a short line railroad, 18.5 miles in length, extending from Bellefonte southwest to State College and connecting with the Pennsylvania Railroad at Bellefonte. Lime Centre is 3.5 miles from the centre of the Pennsylvania yard at Bellefonte. Appellant's business is the quarrying of limestone and crushing of stone, manufacture of fluxing stone, crushed stone, ground limestone, burned lime and all forms of lime products. In the transaction of its business it receives inbound shipments of coal, brick and supplies at its plant and makes outbound shipments of its products. On April 13, 1925, there was docketed with the commission at its Complaint Docket 6483 a complaint by appellant against the intrastate rates charged by Bellefonte Central, Pennsylvania and other carriers upon shipments to and from its plant. A companion complaint was filed with the Interstate Commerce Commission against the interstate rates. The Bellefonte Central Railroad supported appellant to some extent by answering that the rates complained against were published by its connecting line and that it was willing to join in any

rate established by the commission, and by requesting, at the hearings, the application to its line of the Bellefonte rates. The general ground for the complaint against the rates involved in these proceedings was that the rates between stations on the Bellefonte Central Railroad and the remainder of the state were in all instances in excess of the rates on the same commodities to and from Bellefonte by the amount of the Bellefonte Central's local rates, i. e., the rates from the coal fields, from which coal is shipped to appellant, and the rates upon appellant's outbound shipments of its products were higher than the rates to and from Bellefonte. Bellefonte is on a short branch of the P. R. R. running south from Milesburg on the Williamsport Division, which extends from Williamsport through Lock Haven to Tyrone on the main line, Milesburg being approximately halfway between Lock Haven and Tyrone. Bellefonte is also connected with Montandon by a line of the P. R. R. The Bellefonte Central Railroad thus serves the territory between two lines of the Pennsylvania.

After extended hearings the complaints were sustained by both commissions and in a report and order of the Pennsylvania Commission, dated January 3, 1928, it was determined that ''the longer haul and group rates complained of are and for the future will be unjust and unreasonable to the extent that they exceed or may exceed those contemporaneously in effect on like commodities to or from Bellefonte and ...... that the maintenance of rates to or from points on the Bellefonte Central Railroad higher than the rates to or from Bellefonte results and will result in undue prejudice to complainant and the localities served by the Bellefonte Central Railroad and in undue preference of complainant's competitors at Bellefonte and Lamont and of the localities accorded the Bellefonte basis of rates.'' It was further found that

the "shorter haul rates are and for the future will be unjust and unreasonable to the extent that they exceed or may exceed those contemporaneously in effect to or from points on the Pennsylvania Railroad beyond Bellefonte equidistant with the stations on the Bellefonte Central Railroad from Bellefonte." The order directed the carriers to establish by February 25, 1928, and thereafter maintain and apply rates decreased to the extent indicated in the report.

In the complaint against the rates there was included a prayer for reparation for the alleged unreasonable charges which had been collected during the two-year period preceding its filing and would be during the pendency of the proceedings. The report of the commission concluded with the statement that "a claim for reparation is a separate proceeding" and the commission deemed it appropriate to say that, in view of its conclusions directing the establishment of bases for rates for the future only, the situation did not in its judgment "warrant an award of reparation." Appellant, however, under date of August 13, 1928, filed with the commission at Complaint Docket 7790 its complaint against the rates charged since April, 1923, and its petition for reparation upon shipments of its products for the period beginning April 4, 1923, two years prior to the filing of the complaint against the rates, down to February 25, 1928, the effective date of the reduced rates. On October 30, 1928, the commission, referring to its previous report, made an order dismissing this complaint and appellant thereupon appealed from that order to this court. On July 2, 1929, we filed an opinion (Centre County Lime Co. et al. v. Commission, 96 Pa. Superior Ct. 590) in which it was pointed out that the object of a complaint against existing rates is to prevent a public wrong for the future and that a proceeding for reparation is intended to redress a private wrong of the past; that the jurisdiction

of the commission is exercised under separate and distinct sections of the act—as to complaints against existing rates under Section 3 of Article V and upon petitions for reparation under Section 5 of that article; that findings on the issues actually involved in a proceeding against rates furnish no basis for awarding or refusing reparation; and that up to the time the petition for reparation was dismissed there had been no specific determination by the commission with respect to the reasonableness or unreasonableness of the rates in the past. Other questions were involved in the appeal but upon this branch of the case the conclusion reached was that it was the duty of the commission to afford appellant "a hearing upon the question of the reasonableness of the rates in the past and whether it has sustained damages." By way of precaution, it was said: "We do not even intimate that we think appellant is entitled to reparation." The order of the commission dismissing the petition for reparation was accordingly reversed and the record remitted with directions to reinstate the petition and take such proceedings thereon as should not be inconsistent with the opinion. Pursuant to this direction, a hearing upon the question of appellant's right to reparation was had before the commission on October 30, 1929, and resulted in the order of September 23, 1930, refusing reparation, from which order the present appeal was taken.

Appellant's complaint and petition for reparation, as reinstated by this court, invoked the exercise of the powers conferred upon the commission by Section 5 of Article V. After referring to its original complaint against the rates, filed under Section 3 of Article V, and the finding by the commission that they were unreasonable as of January 3, 1928, and would be for the future, it averred that appellant had made, within two years prior to the filing of its original complaint and during the rate proceedings, numerous shipments of its

products, at the then existing rates, to destinations within the state; and that "in almost every instance the commodities were shipped freight collect and the amount of the excess over the rate to and from Bellefonte, Pennsylvania, which is the basis of the claimant's claim for reparation, was in each instance deducted in the adjustment of accounts with the purchasers of the products and was therefore paid and borne by the claimant, and claimant says that due proof of these details will be made upon hearing."

Attached were statements setting forth the details of the shipments upon which reparation was claimed in the aggregate amount, including interest, of $5,336.28; the prayer was that the commission, after a hearing upon the merits, would find that appellant had been injured and would make an order directing the payment to it of the amount of damages it had sustained in consequence of the collection from it in the past of rates which it alleged were unreasonable when collected. In our opinion it became the duty of the commission under this complaint to "determine," in the first place, whether the rates had been unreasonable prior to January 3, 1928, and, if so, proceed, in the second place, to ascertain what damages, if any, appellant had sustained and make an appropriate order awarding or refusing reparation as the evidence might warrant. No further petition by appellant would be necessary to secure reparation if the commission found that the rates had been unreasonable in the past and the evidence showed that it had actually been damaged in an ascertainable amount. We do not agree with the contention of the commission that, "if a shipper is to be accorded reparation, he must file his separate complaint against the past rates, to be followed, if and when they have been declared unreasonable, by his petition for reparation"; we see no valid objection against combining a complaint against past rates, filed under Section 5 of

Article V, and a petition for reparation in one paper; that is a different proposition from including a prayer for reparation in a complaint, filed under Section 3, against existing rates.

At the hearing appellant adduced evidence tending to show that during the period from April, 1923, to the effective date of the lower rates there had been no material change in the equipment or service of the carriers, or in operating conditions, which would affect their rates; that the rates then charged had favored appellant's competitors at Bellefonte and Pleasant Gap, a nearby station on a line of the P. R. R.; that, with the exception of a reduction in February, 1925, on lime products from Lime Centre to Bellefonte, there had been no change in inbound coal or outbound lime products rates; that coal was generally purchased f. o. b. mines; that Bellefonte is a point within a recognized origin and destination rate group; and that appellant and one other plant, Chemical Lime Company, furnished practically forty per cent of all outbound shipments of lime products over Bellefonte Central. There was also testimony that as a result of the reduction in rates under the commission's order there had been a "substantial increase" in the traffic handled by the Bellefonte Central.

Counsel for appellant then offered to prove that appellant "paid and bore the freight charges on the shipments involved to the amounts and for the transportation shown by the schedules made appendices to the petition and thereby had sustained actual damages to the extent of the amounts of reparation claimed and set forth in the said appendices......and to prove the shipments in respect to which such rates were paid and borne, the freight charges in respect to each thereof, the date of each such shipment, and other items set forth in said appendices." Counsel for the carriers objected to the introduction of the proposed evidence

upon the ground that, as there had, as yet, been no finding by the commission as to whether the rates had or had not been unreasonable in the past, the appropriate time for the reception of evidence intended to form a basis for the assessment of damages had not arrived. The sitting commissioner sustained this objection and his ruling was subsequently affirmed by the commission. The second and third assignments are based upon the exclusion of these offers.

We think these assignments are without merit. Obviously, detailed evidence showing the number of shipments made and the rates paid by appellant on each would be immaterial unless and until the commission had determined that the past rates had been unreasonable. It would serve no good purpose to take a mass of testimony relative to the number of shipments and rates paid thereon until the primary question of the reasonableness or unreasonableness of the charges had been determined.

The carriers then offered evidence that Bellefonte is not near the centre of any origin group and introduced a number of maps illustrating the reasons for establishing, and the application of, certain rates. For instance, one map, Exhibit No. 3, was submitted for the purpose of showing that the average distance to Pittsburgh from points of origin accorded a rate of $1.26 per gross ton on lime products was 141 miles; that the average distance from points in the Altoona group to Pittsburgh is 138 miles, but the distance to Bellefonte is 164 miles. Other evidence, which need not be referred to in detail, was introduced in support of the carriers' contention that it does not necessarily follow from the finding of the commission in January, 1928, that the rates were then unreasonable, and would be for the future, that they were also unreasonable in the past.

In Centre County Lime Co. v. Commission, supra,

some reference was made to the nature of the right accruing to a shipper required to pay an excessive rate and to the procedure provided by our Public Service Company Law for its enforcement. It is unnecessary to repeat what was there said; such shipper has a property right in the excess payment, recognized by and enforceable under the common law. Our statute, as stated by the commission, creates no new right in the shipper but merely requires him to institute his claim for reparation before it in the first instance.

"But awarding reparation for the past and fixing rates for the future involve the determination of matters essentially different. One is in its nature private and the other public. One is made by the [Interstate Commerce] Commission in its quasi-judicial capacity to measure past injuries sustained by a private shipper; the other, in its quasi-legislative capacity, to prevent future injury to the public": Bear Bros. v. Denver and R. G. R. R., 233 U. S. 479, 486.

We are not dealing with a case in which a public service company has recently made an increase in its rates which the commission has found to be unjustifiable. Most of the rates attacked were made up by combining the local rates of the Bellefonte Central from Lime Centre to Bellefonte with the rates of the other carriers from Bellefonte to the destination points. The commission did not fix rates on any specified commodities in dollars and cents but condemned the existing structure of the rates and prescribed a method for constructing them in the future which in its judgment would be jointly advantageous to the Bellefonte Central and to shippers on its line. We agree with the commission that "a rate may be unreasonable so that the commission in its legislative capacity may say that from now on the public interest will be better served by its reduction and at the same time reasonable to the extent that the collection of it has not amounted to an

act of extortion or oppression on the part of the utility." It seems to be a fairly well established common law principle that where rates have been put into effect in good faith and maintained without challenge for a considerable length of time, reparation cannot be recovered, even though they have been reduced by a competent tribunal, unless it is shown that they have been unreasonable to the point of extortion. The equitable powers of the courts in the protection of patrons of public utilities from the imposition of excessive charges were considered by our Supreme Court in Brymer et al. v. Butler Water Co., 179 Pa. 231, 250. It was there stated that the court had authority to say: "This charge is oppressive. You must decrease it. You are entitled to charge a price that will yield a fair compensation to you, but you must not be extortionate." The use of the words "oppressive" and "extortionate" furnishes some indication of the common law conception of an unreasonable rate and we think that meaning still applies when ratepayers are seeking redress for alleged private wrongs inflicted in the past.

When, however, the question is whether the rates attacked were unreasonable at the time of the complaint and would be for the future, it is apparent that our Public Service Company Law has modified the common law conception of "unreasonableness." We are in accord with these excerpts from the report of the commission: "If the rate which has been imposed violates the common law standard it is 'unreasonable' in the sense that that word is used in Article V, Section 5. But the same word in Article V, Section 3, which gives rise to the legislative function of the commission does not necessarily have the same connotation, since different elements and factors may enter into the determination of reasonableness in the two cases. The present record presents an apt illustration of this. When the commission undertook to fix rates for the

future it was acting with reference to prospective conditions not definitely known but forecast to the best of its ability. There was evidence before it that lower rates would probably increase tonnage and thereby create advantages to the carriers as against the disadvantage they would suffer by the reduction. The prior report indicates that this was taken into consideration. The evidence adduced by complainant itself in this proceeding indicates that such expectation was justified...... In addition, certain rates of a railroad or group of railroads on a particular commodity or in a particular locality may be unreasonable in the legislative sense although there is nothing to show that such railroads have made, or are likely to make, a fair return on the property devoted by them to the public service. When in such circumstances, reductions of certain rates are required for the future, either the railroads or the commission is in a position to consider whether any modification of other rates may properly be made to offset possible losses from reductions. But as to traffic already moved, there is no possibility of stimulation and no opportunity for readjustment of other rates to make good the loss.'' The Interstate Commerce Commission, under a similar line of reasoning, refused reparation as to the interstate rates. Under the conclusion we have reached, the question raised by appellant with respect to the period for which reparation may be claimed becomes academic and need not be considered in disposing of this appeal.

Upon consideration of the entire record we are not convinced that appellant has met the burden, imposed upon it by the statute, of showing that the order appealed from is unreasonable in the light of all the evidence or contravenes any established principle of law.

It therefore becomes our duty to dismiss the appeal and affirm the order.

Order affirmed.