Lancaster Ice Manufacturing Company et al., Appellants, *v.* Pennsylvania Public Utility Commission.

Argued October 8, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Roberts R. Appel,* with him *Herbert S. Levy, Anthony R. Appel* and *Appel, Ranck, Levy & Appel,* for appellant.

*Carl Rice* and *Witmer & Rice,* for appellant.

*Earl V. Compton,* with him *Compton, Handler & Berman,* for appellants.

*Ernest R. von Starck,* with him *Morgan, Lewis & Bockius,* for industrial user, under Rule 46.

*Miles Warner,* Assistant Counsel, with him *Jack F. Aschinger,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

*Vincent Butler* and *Austin Gavin,* for utility company, appellee.

OPINION BY ERVIN, J., January 21, 1958:

On August 30, 1954 we filed an opinion in *Harrisburg Steel Corp.*[1] *v. Pa. P. U. C.,* 176 Pa. Superior Ct. 550 (allocatur refused 177 Pa. Superior Ct. xxvii), 109 A. 2d 719, and remanded to the Public Utility Commission the consolidated proceeding, "for an order consistent herewith." In that opinion we said, inter alia, at page 553: "Pennsylvania Power and Light Company was formed by the merger of eight utility companies

---

[1] On July 2, 1956 the Commission filed an order substituting Harsco Corporation, one of the present appellants, for Harrisburg Steel Corporation as a complainant.

and was incorporated on June 4, 1920 under the laws of this State. During the following ten years the Company acquired by purchase many other utility companies which were merged into its system for the supply of electric energy throughout the eastern section of central Pennsylvania. The problem which gave rise to the first question here involved, had its origin in the promulgation of a uniform accounting system for public utilities by the Federal Power Commission in 1936. A like system of accounting was adopted by Pennsylvania Public Service Commission which, on January 1, 1937, directed all electric utilities to maintain their books on an original cost basis in accord with the uniform accounting provisions. We are concerned primarily with account 100.5 in the uniform system entitled Electric Plant Acquisition Clause. In this account the Company was required to include 'the difference between (a) the cost to the accounting utility of electric plant acquired as an operating unit or system by purchase, merger, consolidation, liquidation, or otherwise, and (b) the original cost, estimated if not known, of such property, less the amount or amounts which may be credited to the depreciation and amortization reserves of the accounting utility at the time of acquisition with respect to such property.' In this case the account was intended to disclose the amount in excess of depreciated original cost which was paid by the Company for the utilities purchased by it. On December 19, 1944 the Commission in an accounting proceeding initiated by it found that $25,930,121.01 was classifiable in account 100.5 under Electric Plant Acquisition Adjustments. The Federal Power Commission had previously classified the same amount in the same fashion. And both Commissions ordered that the amount be written off the books of the Company by amortization over a 15-year period at the rate of

$1,746,150 per year. There was a vital difference, however, in the two orders: The Federal Power Commission directed that the amount be written off by charges to 'Miscellaneous Amortization' as a *disposition of income;* the Pennsylvania Commission directed the amortization by charges as *operation expense.* And in the instant proceeding the Commission made final its tentative order of December 19, 1944 and thus put the burden on the present rate payers of providing $1,746,-150 annually over a fifteen-year period in addition to a return of a maximum of 5.82% on fair value of $310,-000,000 in accordance with the findings of the Commission.[2] We are agreed that there is palpable error in the order in this respect." We further said in the 1954 opinion: "And although the Commission elsewhere stated that the classification of the amount in account 100.5 was 'not a controlling factor in rate adjudication' yet in the present case the Commission treated its amortization as an expense for rate purposes to be borne by the rate payers in addition to a fair return on the rate base. In so doing it is clear that the Commission has projected its accounting determination into the field of rate regulation and it should be noted that the burden imposed on the rate payers by the present order is much greater than the annual amortization payment itself. The payment is not deductible for tax purposes and it is probable that in order to

---

[2] The record in this case, including that which was before this Court in 1954, indisputably establishes that amortization of account 100.5 was from its inception an expense paid by all of the Company's customers. The first exhibit in the 1954 record (and reproduced in the present case), showing balance for return for each year from 1946 through 1950, stated the annual amortization of account 100.5 as a deduction from all of the Company's operating revenues. It was item 12 and was entitled "Amortization of Electric Plant Acquisition Adjustments."

produce a net of $1,746,000 after taxes, the rate payers would have to pay more than twice that amount annually. This is the equivalent of a further increase in the rate base. . . . The amount paid by the Company in acquiring the utilities, even if it be assumed that the transactions were at arms length, cannot be adopted as original cost for rate making purposes. Original cost is such cost 'when first devoted to public service' (§502 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1212) and cannot be construed to mean a larger amount which a new owner is obliged to pay on purchase of the property of a utility. Scranton-Spring Brk. W. Serv. v. Pa. P. U. C., 165 Pa. Superior Ct. 286, 67 A. 2d 735."

The 1954 appeal stemmed from a rate case before the Commission (C.15559 et al.) in which the present appellants and other industrial, large commercial and resale customers of the Company challenged, inter alia, its claim of $1,746,150 as an annual expense required to amortize account 100.5. On September 12, 1951, the Company filed with the Commission the increases in the basic rates of its large customers. These increases were designed to enhance the annual revenues by approximately $3,000,000. The Commission suspended the proposed increases and initiated its own complaint at C.15559 to determine the justness and reasonableness of the rates proposed. Complaints were also filed by 137 customers of the Company, including the four present appellants, of the 2,435 affected by the filings. All of the complaints were consolidated by the Commission for hearings. On July 30, 1952 the Commission modified the proposed large customer rates and, as modified, provided that they should become effective as of August 12, 1952. Appeals were then taken by the present appellants, who contended that the Commission had erred in (1) conforming certain preferential rates in

effect in the area of Lancaster to the balance of the Company's rate structure; (2) allowing the ratepayers to be charged with the balance of a deficiency in the Company's reserve for depreciation; and (3) allowing the ratepayers to be charged with the expense of annual amortization of account 100.5. In the 1954 decision we affirmed the Commission with respect to the first and second assignments and, as above noted, reversed and remanded with respect to the third. On remand, the Commission, after further hearings, excised the amortizations of account 100.5 as an element of operating expense and then redetermined, in the light of actualities during the period from August 12, 1952 to February 28, 1955, the Company's allowable revenues. On November 20, 1956 the Commission filed an opinion and order in which it found that actual revenues for the above mentioned period had exceeded allowable revenues by $5,267,280 and added thereto accrued interest of $1,053,456, making a total of $6,320,-736 as the amount to be refunded. It then ordered the Company to refund this sum of money to its large and small customers[3] in the ratio in which those classes had contributed to its total revenues during the period over which the excess accrued.

It is the appellants' contention on the present appeals that the entire fund should have been refunded to them, the large customers, and that nothing should have been refunded to the small customers.[4] The Com-

---

[3] "Large customers" refers to the Company's industrial, large commercial and resale customers served during the refund period under tariffs GLP-3, GLP-4, GLP-5, CC-3, P-102RES-3, P-102RES, P-71CMT-3, P-85CMT-1, P-97ST-5 and 15-B. Small customers were then being served under tariffs RS, LP-1, LP-2, P-RS, P-LP-1 and P-LP-2.

[4] The Company has since refunded to its large customers, including appellants, the sum of $2,549,031, representing those cus-

pany has renounced all claim to the fund which it holds, and, as stakeholder, intervenes in name only in appeals Nos. 121 and 125. No brief was filed nor argument made in behalf of the Company in the present appeals.

The testimony shows that on January 3, 1945 the Commission filed an order, not appealed, in which it found that the existing rates (as modified since 1933 by voluntary reductions and temporary rates) are "not unjust, unreasonable, or productive of an excessive return," and dismissed the complaints then before the Commission. Those proceedings dealt with overall return and no question relating to rate structure was raised. On February 10, 1948 the Company placed in effect a fuel adjustment clause for the purpose of recouping from certain of its large commercial, industrial and resale customers a portion of the expense resulting from variations in the cost of fuel. This clause, as later modified by the Commission, remained in effect until the current large customer rates became effective on February 28, 1955. On August 24, 1949 the Company filed with the Commission new tariffs increasing the rates for its small customers by approximately $2.1 million annually. The Commission per-

tomers' share of the total refund as directed by the Commission. This sum includes $52,132 which the Commission on June 24, 1957, by supplemental order entered by leave of the Superior Court, directed to be paid to Phila. and Reading Corporation, an industrial customer originally excluded from all participation in the refund. The balance of the fund amounting to $3,697,398 (not including the balance after payment of $52,132 to Phila. and Reading Corporation, of an additional $126,439 which the Company segregated following that customer's assertion of entitlement to a refund) has been segregated by the Company from its property and is being held by it in obligations of the United States under this Court's order of supersedeas of January 12, 1957, pending resolution by this Court of the issue of the class of customers entitled thereto.

mitted these rates to become effective on October 24, 1949, without suspension, and they are currently in effect. Two private complaints, filed prior to the effective date of the increases, were dismissed by the Commission on January 2, 1951. In dismissing these two complaints the Commission said: "While the computations which produced these percentages have not been refuted in this record, our use of them herein is not to be taken as committing us to their acceptance in any future proceeding." Thereafter, on September 12, 1951, the Company filed with the Commission the increases in the basic rates of its large customers which ultimately led to our 1954 decision. The appellants contend that the large customers alone have contributed to the fund in dispute and, "absent any intervening equity" are alone entitled to it. It is indisputably established by the record in this case that amortization of account 100.5 was from its inception an expense paid by all of the Company's customers. R. C. Swartz, a vice-president of the Company, testified: ". . . in the postwar period the element of cost represented by amortization of Account 100.5 for rate making purposes has been reflected in the entire basic rate structure of the company. As I have previously related, changes in the basic rate structure were made in 1949 for the residential rates and the small light and power rates, and in 1952 for the large power users. In both cases amortization of Account 100.5 was treated as a part of the cost of service for rate making purposes. This is clearly shown by the company's tariff filings made on August 24, 1949 for the residential and small light and power rates, and on September 12, 1951 for the rates of the large power users. In neither case was amortization of Account 100.5 stated to be or relied upon as a reason for making the increase in rates.

"In my judgment, these considerations definitely point to three conclusions. First, that amortization of Account 100.5 is, by its nature, an all-customer type of cost; second, amortization of Account 100.5 has been treated as an all-customer type of cost in the increases which have been made in all of the company's basic rates during the postwar period, and third, that any refund which might be adjudged to be due by reason of a retroactive disallowance of amortization of Account 100.5 could not in any sizeable amount be made to any one class of customers without unreasonably distorting proper rate relationships existing in the company's basic rate structure."

The appellants' contention is based on the fallacious premise that the 1952 large customer increases were caused by or were specifically related to amortization of account 100.5. Neither the 1949 small customer increase nor the 1952 large customer increase were so caused or related. In filing for each of these increases, the Company predicated its claim for increase not on account 100.5 amortization but on an assertion of need for general enhancement of revenue. Therefore the dollars of increase paid by appellants from and after August 12, 1952 were not earmarked to amortize account 100.5 but went to enhance the Company's general revenues, in which the element of 100.5 amortization had inhered since 1944 as an expense to all of its customers. Both the large and the small customers contributed to the excess ordered refunded and did so simultaneously during the period from August 12, 1952 to February 28, 1955, over which the excess accrued. To do equity, the excess should be refunded to all of the customers who contributed to it.

It is also contended by appellants that the Commission's order "was an usurpation of power not granted

to it under . . . [§313[5]] of the Public Utility Code. . . ." It is argued that under that section refunds are authorized only to persons whose rates have been found "unjust or unreasonable, that is, unlawful." It is urged that "the only rates . . . found . . . unlawful . . . are the rates to the large . . . customers erroneously increased by the Order of July 30, 1952", and that refunds therefore accrue to the large customer alone. Section 313 says clearly that the Commission's statutory authority to order a refund where past revenues are found excessive extends to "the amount of any excess paid by any patron in consequence of such unlawful collection." By "such unlawful collection" can only be meant a collection found unlawful by reason of the Commission's determination "that any rate received by a public utility was unjust and unreasonable. . . ." Had the legislature intended, as appellants argue, to limit Commission authority over refunds to those accrued by payments to the utility under the particular tariffs in litigation, its grant of authority would have been expressed in terms less broad than "any excess paid by any patron, in consequence of such unlawful collection." In our 1954 opinion we said: "In any view, except to the extent that the intangible values contribute to the fair value of the whole, the rate payers cannot be compelled to pay a return on the investment, much less restore to the company the excessive price paid, through the device of amortizing the cost as an operating expense." We, in effect, said that it was unjust and unreasonable to include in operating expense the amortization of account 100.5. The allocatur having been refused by the Supreme Court, this becomes the law of the case. The Commission, having found that the rates were unjust and unreasonable as

---

[5] Act of May 28, 1937, P. L. 1053, art. III, §313, 66 PS §1153.

to all customers, was really following the mandate of this Court. Section 313 contained the limitation that "a refund shall be made for and on behalf of all patrons subject to the same rate. . . ." This limitation prohibits an award to less than all patrons paying any one rate but it does not prohibit the payment of a refund to other ratepayers under other schedules of rates.

Appellants also argue that the rates for the small consumers are commission made rates and may not be changed retroactively. It is the law of this Commonwealth that commission made rates may be changed only prospectively. Such rates are not subject to the retroactive imposition of refunds: *Cheltenham & Abington Sewerage Co. v. Pa. P. U. C.,* 344 Pa. 366, 25 A. 2d 334; *Peoples Natural Gas Co. v. Pa. P. U. C.,* 153 Pa. Superior Ct. 475, 34 A. 2d 375; *West Penn Power Co. v. Pa. P. U. C.,* 174 Pa. Superior Ct. 123, 100 A. 2d 110. In all of the above cases the utility was the appellant and was invoking the doctrine of commission made rates for its own protection. This principle of law exists for the protection of the utility from unfair reparations. In the present case, the Company has renounced all claim to the fund in its hands and intervenes as stakeholder herein in name only for the purpose of being bound by the decree. The appellants are without scope of the doctrine of commission made rates and without standing to invoke it. Even if it be assumed that the award of refunds to the Company's small customers was as to the Company a retroactive reduction of commission made rates and constitutionally defective, it does not follow that that award has invaded any constitutional right of the Company's large customers. The order of the Commission refunds to both classes of customers its pro rata share of the unlawful excess collected by the utility. Nothing is being taken from the large ratepayers and being given

to the small ratepayers. Each class of customers is receiving only its pro rata share of the excess. It is also contended that no refunds should be made to the small customers because no complaint was filed by them or by the Commission challenging their rates. We are of the opinion that the effect of appellants' challenge to the Company's claim to amortization of account 100.5 was sufficient to place in jeopardy all of the rates which reflected the unlawful inclusion of amortization of account 100.5 in operating revenues. In reparations the Commission's jurisdiction is equitable in nature: *Centre County Lime Co. v. P. S. C.,* 103 Pa. Superior Ct. 179, 157 A. 815; *Chambersburg Gas Co. v. P. S. C.,* 120 Pa. Superior Ct. 206, 182 A. 94; and the Commission is not without discretion in exercising its equitable powers: *Magee Carpet Co. v. Pa. P. U. C.,* 174 Pa. Superior Ct. 438, 102 A. 2d 229. In excising from the Company's lawful revenues the proscribed element of account 100.5 amortization and ordering it refunded to the ratepayers to the extent that its collection has enriched the Company, the Commission did not "distribute to one class of customers money paid by another class." On the contrary, the order has done exact justice to each of the customer classes affected by 100.5 amortization from August 12, 1952 to February 28, 1955.

We conclude that the Commission's order of November 20, 1956, as modified on June 24, 1957, should be affirmed. The case is remanded to the Commission so that it may restate its final order with new prospective dates for the performance thereof by the utility.