Pennsylvania Railroad Company, Appellant, *v.*
Public Service Commission.

2

Argued October 21, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Windsor F. Cousins,* for appellant.

*John C. Kelley,* with him *Harry H. Frank, Samuel Graff Miller* and *Richard J. Beamish,* for appellee.

OPINION BY CUNNINGHAM, J., February 26, 1937:

By supplement 21 to its tariff, P. S. C. Pa. 727, the Pennsylvania Railroad Company gave notice of a proposed increase, from 55 cents to 80 cents per net ton, in its intrastate rate for the transportation of common sand and gravel in carload lots from Morrisville, Pa., to the Philadelphia area, to become effective April 13, 1936. Prior to the effective date, Amico Sand & Gravel Company and Mercer Sand & Gravel Company, invoking the provisions of Section 3 of Article V of the Public Service Company Law of July 26, 1913, P. L. 1374, 66 PS §492, filed protests with the commission at the above complaint docket numbers against the proposed increase.

Pursuant to the provisions of Section 4 of Article V, as amended by Section 7 of the Act of June 3, 1933, P. L. 1526, 1537, 66 PS §493, (Supplement), the commission on March 31, 1936, suspended the operation of the new rate until June 30, 1936. In the meantime, viz., on June 15th, the commission, after a hearing, concluded the carrier had failed to justify the proposed increase and made an order directing it to cancel its supplement and restore the 55-cent rate. The present appeals are by the carrier from that order; upon the filing of the bond required by Section 19 of Article VI of the statute, 66 PS §832, the order of the commission was automatically superseded during the pendency of the appeals in this court and the supplement became effective on June 30, 1936. As the same questions are involved under each appeal, but one opinion will be necessary.

An understanding of the facts which led up to the filing by appellant of the supplement involved in this proceeding is essential. It was not, in fact, an ordinary

and voluntary increase in rates, but was the restoration to its former level of a rate which had been lowered for a special purpose. The following history of appellant's rates upon common sand and gravel from Morrisville to some sixty points within the limits of the City of Philadelphia appears from the testimony and exhibits before us.

For about four years prior to the summer of 1933 these rates had been based upon the so-called Birdsboro Scale which was superseded in Pennsylvania by the Lycoming Scale, applicable throughout the Eastern Trunk Line territory, and were 70 cents per ton to ten of the Philadelphia points, and 80 cents to the remaining destinations in that city.

There were four operators with plants located at Morrisville—Warner Company, Curtis & Hill Gravel & Sand Company, [subsequently absorbed by Warner], Amico Sand & Gravel Company, and Mercer Sand & Gravel Company, the two last mentioned being the complainants in this proceeding. From the plant of the Warner Company 98% of the shipments were hauled in its own trucks to the Delaware river and then conveyed by its own tugs and barges to the Philadelphia area; the remaining 2% moved by rail. The other operators at Morrisville were located on appellant's line and shipped exclusively by rail. Appellant decided to make an effort to attract tonnage, which would otherwise move by truck and water, by making a substantial reduction in its rates from Morrisville to Philadelphia, and accordingly put in force, on June 29, 1933, a rate of 50 cents per ton, which on October 1st of that year became 55 cents. This rate was arrived at by an "approximation of a 20 cent rate by water ...... and the approximation of 30 cents which would be the average rate from a certain point in Philadelphia to other Philadelphia stations," plus the 5 cent emergency

charge. June 30, 1936, was fixed by appellant for the expiration of this experimental rate.

That the reduction had some results is indicated by the fact that during the period from April, 1932, to June, 1933,—prior to the reduction—only 49 carloads of sand were shipped from Morrisville to Philadelphia stations, but during the period from July, 1933, to August, 1934—following the reduction—1745 carloads were shipped. The bulk of this tonnage, 1696 cars, came from shippers other than Amico or Mercer.

In September 1934, the picture began to change. During the fifteen months, January 1935, to and including March 1936, Amico shipped only 14 cars and Mercer 11 from Morrisville to Philadelphia points, and other shippers at Morrisville shipped only 476 cars.

Appellant's main justification for restoring the rate to the level of rates prescribed by the Lycoming Scale is based upon the following proceedings before the Interstate Commerce Commission instituted by certain shippers of sand whose plants are located at Birmingham and South Pemberton, New Jersey. The distance from Morrisville to various Philadelphia points ranges from 30 to 40 miles, and the distance from Birmingham and South Pemberton to the same points is only three miles longer. At the time of the reduction of the Morrisville rate in 1933, the rates which the shippers of sand from Birmingham and South Pemberton to Philadelphia were obliged to pay were fixed by the so-called Buckland Scale in New Jersey, which is comparable with the Lycoming Scale in Pennsylvania, and ranged from 80 to 90 cents per ton; no change was made by appellant in these interstate rates.

In June, 1934, Norcross Brothers, shippers of sand from Birmingham and South Pemberton to Philadelphia and other destinations, filed their complaint with the Interstate Commerce Commission, alleging that the Buckland Scale rates were unreasonable "and that the

6

lower intrastate rates on like traffic from the plants of complainants' competitors at Morrisville, Pa., cause and have caused undue and unreasonable prejudice and disadvantage to complainants and undue and unreasonable preference and advantage to these competitors." In its opinion, filed September 26, 1935, and reported under the title, *Norcross Brothers v. Pennsylvania Railroad Company,* 210 I. C. C. 629, the Interstate Commerce Commission, after reviewing the situation of the shippers at Birmingham and South Pemberton as compared with those at Morrisville, pointed out that appellant by the reduction of June 29, 1933, had enabled the Amico, Mercer and Curtis & Hill plants at Morrisville to ship into the Philadelphia area in competition with the Warner Company, shipping by water, but had refused to accord Norcross Brothers and other shippers at Birmingham and South Pemberton a like opportunity. In that proceeding the present appellant opposed the reduction of the interstate rate from Birmingham and South Pemberton to Philadelphia upon the ground that the entire Buckland Scale would be jeopardized if Norcross Brothers were accorded the same rate as their competitors at Morrisville. To this the Interstate Commerce Commission replied: "But by according the three operators at Morrisville an opportunity to ship by rail into the Philadelphia area in competition with those who ship by water, and by declining to accord complainants, whose plants were formerly grouped with Morrisville, a similar opportunity, defendant is in effect selecting from among operators similarly situated the ones which they desire to ship by rail, thereby causing undue and unreasonable preference and advantage to the operators which are so selected and undue and unreasonable prejudice and disadvantage to the operators which are not."

It appears from the report of the Interstate Commerce Commission that notice of the proceeding by

Norcross Brothers against appellant was given the Public Service Commission of Pennsylvania. The complaint of Norcross Brothers resulted in a finding by the Interstate Commerce Commission that rates exceeding the Buckland Scale were unreasonable to the extent they exceeded that level, "and that the lower intrastate rates on like traffic from the plants of complainants' competitors located at Morrisville, Pa., cause and have caused undue and unreasonable prejudice and disadvantage to complainants and undue and unreasonable preference and advantage to said competitors, that the transportation conditions surrounding the movement of this commodity to the Philadelphia area from complainants' plants and those of said competitors are substantially the same, that complainants have not shown sufficient proof of damage to support an award of reparation by reason of such undue and unreasonable prejudice, preference, advantage, and disadvantage, but that same can, and should be, removed by the maintenance on this traffic, from complainants' plants, of interstate rates not exceeding rates made under the Buckland Scale, which we find to be reasonable maxima, and not less than a rate of 55 cents, which we find to be a reasonable minimum, and by the maintenance on like traffic from the plants of the above-described competitors of intrastate rates which shall not be less than the reasonable interstate rates concurrently maintained from complainants' plants. We further find that the other rates assailed are not shown to have been or to be unreasonable or otherwise unlawful. ...... Following the practice of this commission in such cases, we shall for the present leave it to defendant, after consultation, if necessary, with the Pennsylvania Commission, to remove the undue and unreasonable prejudice, preference, advantage, and disadvantage herein found to exist. If this be not accomplished within 90 days from the service

of this report, the matter may be brought to our attention."

Confronted with this order, under which it had the alternative of lowering the Birmingham or raising the Morrisville rate, appellant naturally chose the latter method of compliance and by the supplement now assailed went back to the Lycoming-Buckland Scale of 80 cents per ton. There are some sixteen other sand producing points in New Jersey now having the Buckland Scale. It is reasonable to assume that shippers at each of these points would have promptly demanded, and been entitled to receive, comparable reductions, if the Birmingham rate had been lowered.

There can be no question about the authority of the Interstate Commerce Commission to order that the intrastate rate from Morrisville "shall not be less than the reasonable interstate rates concurrently maintained" from Birmingham, or about the duty of the state commission to cooperate in the elimination of the discrimination: *Lehigh & N. E. R. R. Co. v. Pub. Ser. Com. et al.*, 277 Pa. 493, 121 A. 205; *Houston & Texas Ry. v. United States*, 234 U. S. 342. It is equally clear that appellant was legally entitled to the alternative given it; *Texas & Pacific Ry. Co. v. United States*, 289 U. S. 627.

The order could be complied with by raising the Morrisville rate, lowering the Birmingham, or by modifying both. Having elected to raise the Morrisville, appellant had the burden of justifying its increase in that rate. Whether it has met that burden by its evidence is the controlling question in these appeals. We think it may properly be remarked that it had the advantage of a presumption in favor of the reasonableness of maintaining the Birmingham rate. It is in harmony with the Buckland-Lycoming Scales. Not only did the Interstate Commerce Commission specifically find the Buckland Scale rates from Birmingham to be reasonable in

the proceeding before it, but our own commission has repeatedly applied the Lycoming Scale.

In addition to the opinion expressed by George T. Daly, one of the commerce agents of appellant, to the effect that if the rates from Birmingham and South Pemberton should be reduced to the Morrisville rate "the entire structure of sand and gravel rates in this territory will be endangered and will be likely to fall," R. F. Hogan, traffic manager of the Warner Company, when asked whether he disagreed with that opinion, replied: "No, I think had the Pennsylvania Railroad complied with the Interstate Commerce Commission's Section 3 order in the Norcross case, by reducing the rate from South Pemberton to Philadelphia, that both yourselves and Reading Railroad would be forced to reduce the rates from all competitive points offered to ship into Philadelphia. In fact one of our competitors at Durham, Pennsylvania, has a formal complaint filed with the Pennsylvania Commission asking for reduced rate to Philadelphia."

There is no middle ground in this case. The commission not only found that appellant had failed to justify the 80-cent rate, but expressly fixed 55 cents as the reasonable rate for the future.

In support of this finding the commission said: "The respondent recognized when it published the rate of 55 cents that the higher rate which it now proposes to reinstate, prohibited the movement of the traffic. The lower rate moves traffic and is essential to the complainants' ability to reach their nearest large market."

Our examination of the record fails to disclose evidence supporting these conclusions.

We have already referred to the figures showing that during the first year of the lowered rate shipments from Morrisville increased but shortly thereafter fell off so rapidly that the experiment was shown to have

failed of its purpose—to attract tonnage in competition with shipments by water.

When the complaints were heard before the examiner, shipments by rail had practically stopped. As we read the evidence, it shows that the lower rate has not "moved traffic" and that there is no probability it will do so in the future.

The witness Hogan testified upon this point as follows:

"Q. Now I want to ask you if the rate of 55 cents is maintained in the future from Morrisville to Philadelphia, will that have the effect of attracting some of this tonnage in the future away from your barges to the railroad? A. In my opinion it wouldn't, no, sir. Q. Do you mean that that rate wouldn't be low enough to attract tonnage? A. Well in my opinion, Mr. Cousins, I don't believe the carriers could make the rate low enough to attract tonnage of sand and gravel from the Morrisville district to Philadelphia by rail. In the Norcross case before the Interstate Commerce Commission, to which you previously referred, I testified that a rate of 20 cents from Morrisville to Philadelphia wouldn't be attractive to us." Moreover, "the fact that traffic does not move is not conclusive that the rates are not reasonable": *McCrady Bros. Co. v. Pittsburgh & L. E. R. R. Co.*, 66 Pa. Superior Ct. 307, 313.

It seems to be settled that regulatory commissions may not lawfully compel railroads to reduce their rates below a reasonable level in order to meet water or truck competition.

The reduced rate, now sought to be restored, was an experimental or trial rate from its inception and was published with notice that it would be effective for only a limited period.

The supplement cancelled by the commission merely brings it into line with the established and approved

basis of rates applicable in the territory under consideration to both interstate and intrastate traffic.

Although carriers may not be compelled to meet water competition, they may lawfully attempt to do so of their own volition and, within the zone of reasonableness, reduce their rates for the purpose of attracting traffic to their lines. If the experiment fails, it would not be just to penalize them by holding, as the commission seems to have done in this case, that they have estopped themselves from restoring their rates to the existing and approved scale.

Our independent judgment, arrived at from a careful reading of the record, is that appellant has justified the restoration of its rates upon sand and gravel from Morrisville to Philadelphia points to 70 and 80 cents per ton, as provided in the supplement cancelled by the commission. As we view this case, the order of the commission is neither reasonable nor in conformity with established principles of law. The first and second assignments of error are accordingly sustained.

Order reversed.