Pennsylvania Railroad Company et al., Appellants, *v.* Pennsylvania Public Utility Commission.

Argued October 10, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Windsor F. Cousins,* with him *R. W. Barrett, George C. Doering, Carleton W. Meyer* and *J. F. Shrader,* for appellants.

*Samuel Graff Miller,* with him *Macin E. Estill, Edward Knuff,* and *John C. Kelley,* for appellee.

OPINION BY CUNNINGHAM, J., March 16, 1939:

The general subject matter of this appeal is the reasonableness of certain intrastate group and differential freight rates, charged by the appellant carriers for the transportation of fire brick in carloads from origin points in western Pennsylvania to destinations in the central and eastern parts of the state. Five specified shipping points and five origin groups are involved in the present proceeding. With reference to destinations, we are concerned with two groups: (a) The Philadelphia group, embracing that city and surrounding territory; and (b) The Baltimore group, which includes Harrisburg and Steelton.

On February 4, 1937, The McLain Fire Brick Com-

pany, manufacturing fire clay brick at Merrill, Pa., some thirty miles northwest of Pittsburgh and located within the Pittsburgh group, filed its complaint with the then existing Public Service Commission alleging that the rates charged by the Pennsylvania Railroad Company, Reading Company and Lehigh Valley Railroad Company, for the transportation of its product to points in the Baltimore and Philadelphia destination groups are unjust, discriminatory, and unduly prejudicial to it.

On February 17, 1937, a similar complaint was filed against the Pennsylvania Railroad Company and Reading Company by North American Refractories Company, engaged in the manufacture of fire brick at St. Marys, a point in the Johnsonburg group, embracing considerable territory in northwestern Pennsylvania.

On April 26, 1937, complaints to the same effect were filed by The Garfield Fire Clay Company, doing business at Bolivar, against the Baltimore & Ohio Railroad Company, the New York Central Railroad Company, the Pennsylvania Railroad Company and Reading Company, and by Haws Refractories Company, located at Johnstown, against the same carriers,—both of which points of origin are within the Johnstown group. A number of other shippers, and particularly Harbison-Walker Refractories Company, having one of its plants at Templeton in the northern portion of the Connellsville group, were permitted to intervene.

The above mentioned Pittsburgh, Johnsonburg, Johnstown and Connellsville groups are four of eight origin groups of varying sizes, all located west of the Susquehanna River and each taking its name from a municipality constituting a railroad centre within its boundaries. The four additional groups of origin are the Brookville, Cumberland, Lock Haven and Clearfield groups; of these, the Clearfield group is the only one with which we are presently concerned.

When the complaints came on for hearing before the

Public Utility Commission, successor to the Public Service Commission, they were consolidated and disposed of in one report and order, dated January 10, 1938.

The rates assailed by the respective complaints are $3.15, per net ton, from Merrill, in the Pittsburgh group, to destination points within the Baltimore group, and $3.35 to points within the Philadelphia group. These rates were reduced by the order of the commission to not more than $2.60 to the Baltimore group and not more than $3.05 to the Philadelphia group,—a reduction of 55¢ per ton in the former and 30¢ in the latter. The existing rates from Templeton, in the Connellsville group, to points in the Baltimore group are $3.10 per ton, and to the Philadelphia group $3.30. The reductions ordered were to $2.55 for the Baltimore destination group and $3 to the Philadelphia group. The present rates from St. Marys, in the Johnsonburg group and from Bolivar and Johnstown, in the Johnstown group, to the Baltimore group are $3.05 per ton, and to the Philadelphia group $3.25. They were reduced by the order to $2.50 for the Baltimore group, and $2.95 to the Philadelphia group. Each reduction was in the amount of 55¢ per ton upon all shipments to the Baltimore group, and 30¢ to the Philadelphia group.

The present appeal is by the carriers from the order directing them to put these reductions into effect on or before March 7, 1938; a supersedeas of the order was granted by this court and the reasonableness and legality of the order are now before us for disposition.

It should be noted at the outset that the alleged discrimination asserted in the complaints did not arise out of the establishment of rates by the carriers of their own volition. All of the rates involved in this appeal were prescribed either by the Interstate Commerce Commission or by the Public Service Commission of the Commonwealth of Pennsylvania. If complainants have

been subjected to any discrimination or prejudice it is the result of an order of the former state commission, entered November 25, 1936, hereinafter discussed.

Some understanding of the nature, structure and history, of the rates now attacked is essential to a disposition of the questions of law arising under this appeal.

The history goes back to 1922, at which time a readjustment was made by the federal commission of interstate rates upon "articles in the uniform brick list." The case in which it was made is *National Paving Brick Mfrs. Asso. v. A. & V. Ry. Co.*, 68 I. C. C. 213, frequently referred to as the "General Brick" case. It applied throughout the territory east of the Mississippi, and north of the Potomac River. Rates were not fixed upon a mileage basis, but from large origin groups to large destination groups and by a group and differential system. The eastbound movement had as its foundation a key rate from Chicago to New York and from Pittsburgh to New York. The key rate from Pittsburgh to New York was $4.20 per ton. Intermediate rates were related to the key rate, not by distances but by specified differentials. This system has not been assailed in the present case. We are here concerned, inter alia, with shipments originating in the Pittsburgh group, which also extends into Ohio, and from which shipments go to destination groups in eastern Pennsylvania and along the Atlantic seaboard.

Port differentials over and under New York also figured in the adjustment. All destinations involved in this case are in the Philadelphia group except Harrisburg and Steelton, which, as above stated, are in the Baltimore group. The key rate from the Pittsburgh group to the Philadelphia group was adjusted at $3.80 and to the Baltimore group at $3.60. A differential under the key rate of 5¢ per ton was given the Connellsville group as the next eastern group; 10¢ to the

Johnstown and Johnsonburg groups; and 20¢ to the Clearfield group.

Ten years later the rate structure set up in the "General Brick" case was again examined and affirmed in *Victor Cushwa & Sons v. Arcade & A. R. Corp.*, 185 I. C. C. 280. In 1936 a proceeding, designed as *Eastern Brick Rates*, 218 I. C. C. 59, involved a comprehensive rate investigation. The Interstate Commerce Commission again affirmed the adjustment of 1922. Excerpts from its opinion read:

"The brick adjustment in official territory has not changed materially since the General Brick case. It is set forth therein and reviewed in *Victor Cushwa & Sons, Inc. v. Arcade & A. R. Corp.*, 185 I. C. C. 280. It is desirable, however, here to restate in some detail the major features of the adjustment. In official territory there is in effect a combination of several methods of rate making, the principal ones of which may be outlined as follows: ...... (4) On eastbound traffic two main bases are observed. From western Pennsylvania, the Pittsburgh-New York rate is used as the key rate with rates from other origin groups in that part of the state made differentials under the Pittsburgh rate. The rates from Pittsburgh to the Baltimore and Philadelphia groups are fixed differentials under New York and to other destination groups in trunk-line territory the rates are made percentages of the Pittsburgh-New York rate."

At the time of this investigation the state commission had pending before it complaints against fire brick rates by *Central Iron and Steel Co. et al.*, (Harrisburg) and *Manufacturers' Association of Lancaster v. Pennsylvania R. Co.*, 15 P. S. C. 495. It accordingly instituted an inquiry and investigation, of its own motion, and joined in the investigation with which the federal commission was then concerned upon the theory that any "determination thereon should be of state-wide application."

As a result of the joint investigation of 1936, the state commission found, no unreasonableness in fire brick rates generally, but sustained the complaint of Central Iron and Steel Company.

It is self evident, under a group and differential adjustment, that as the origin and destination groups geographically approach each other the haul becomes shorter and a point is reached at which group to group rates will become unreasonable. In order to take care of situations thus arising the Interstate Commerce Commission prescribed, as a part of the readjustment, rates based upon a mileage scale for distances of less than 150 miles.

In the case now at bar the relative geographical positions of the Clearfield and Baltimore groups created a situation to which in the opinion of the state commission, a mileage scale was applicable. The distance from Clearfield to Harrisburg is 148 miles and when the reasonableness of the interstate rate of $3.40 from the Clearfield to the Baltimore group was questioned before the state commission in *Alan Wood Iron and Steel Company v. P. R. R.*, 9 Pa. P. S. C. 319, in 1928, the distance factor was taken into consideration and the rate reduced from $3.40 to $2.95, and the interstate rate of $3.60 from Clearfield to Philadelphia was also reduced to $3.15. As a result of the investigation of 1936, these rates were further reduced, upon a mileage basis, from $2.95 to $2.40, and from $3.15 to $2.85, respectively, by the order of November 25th of that year. That order contained no specific provision with respect to any rates from points of origin in any group except the Clearfield group.

The report of the present Pennsylvania Public Utility Commission, supporting the order of January 10, 1938, now appealed from, seems to indicate that it proceeded upon the theory that the rates from the Johnsonburg, Johnstown, Connellsville and Pittsburgh groups were not in issue in the 1936 investigation and that the

"present rate situation was not contemplated by the [former] commission to follow its order in *Manufacturers' Association of Lancaster v. P. R. R.,* supra." It seems to us, however, that the rates reduced by the present order were necessarily considered in the investigation of 1936, because, as above indicated, that commission joined in the investigation upon the theory that any "determination" made at that time "should be of state-wide application."

The carriers did not appeal from the order of November 25, 1936, apparently conceding that the short distance from Clearfield to Harrisburg justified the application of a mileage scale from the Clearfield group to the Baltimore group.

Whether the present complaining shippers, whose plants are located in the more distant origin groups, are justified in demanding some reduction in their present rates is not a question for us to decide; it is a matter primarily within the administrative jurisdiction of the commission. But it is our duty to see that any reductions to which the commission deems them entitled are made within established principles of law.

It happened that the application of a mileage scale between the Clearfield and Baltimore groups in 1936 resulted in a reduction of 55¢ per ton from the then existing rate of $2.95, making the rate of $2.40 which has not been disturbed by the present commission.

It is abundantly clear that the commission in making its present order has not followed the theory of its predecessors. The reductions now ordered in favor of the complainants and all shippers in the Pittsburgh, Connellsville, Johnstown and Johnsonburg groups have not been made on a mileage basis. To illustrate, the commission by the order now before us retains the reduced rate of $2.40 from Clearfield to Harrisburg, a distance of 148 miles, but allows only 20¢ additional for transporting a ton of brick from Merrill, in the Pittsburgh group, to Clearfield, a distance of 133 miles.

In referring to the scale rate, the commission remarks that "it was designed for short-haul rates and the differential system for the long-haul rates."

As we understand the evidence, the mileage scale, originally designed for distances not exceeding 150 miles, may be so extended as to apply to distances up to 447 miles.

We are not convinced that the plan, adopted by the commission, of deducting from the existing rates from the Pittsburgh, Connellsville, Johnstown and Johnsonburg groups the same amounts—55¢ to the Baltimore group and 30¢ to the Philadelphia group—as were deducted from the Clearfield rates in 1936, is in accord with applicable legal principles and justified by the evidence. Instead of making the present reductions upon a mileage basis the commission held that "the recognized differentials over the Clearfield group rates" should be applied. The difficulty, as we see it, is that the differentials now in use are not *over* the Clearfield rate but *under* the Pittsburgh rate. It is argued in behalf of appellants that the commission has now reversed the process by starting with a low rate near the center of the eastbound adjustment, and making Clearfield, instead of Pittsburgh, the key point.

It is clear from the above quoted excerpt from the opinion of the federal commission in Eastern Brick Rates that the basis for the adjustment was "differentials under the Pittsburgh rate."

One criticism made by appellants of the order is that it prescribes rates not only from Merrill, St. Marys, Bolivar and Johnstown, the only points of origin specified in the complaints, but also from every shipping point in the entire Pittsburgh, Johnsonburg and Johnstown groups; it also fixes rates from the Connellsville group, of which no mention is made in any complaint. It is equally true that it contains no reference to shippers in the Lock Haven, Brookville and Cumberland

groups. We think, however, that the appeal should turn upon the more serious problems involved.

It is difficult to escape the conclusion that the purpose and effect of the order is to assist certain groups of shippers to compete with rival producers whose plants are closer to the markets.

The theory of the commission's action seems to be that it is essential that the rates from the Pittsburgh, Johnsonburg, Connellsville and Johnstown groups be closely related to the Clearfield rate in order to enable the present complainants to compete successfully with producers in the Clearfield group and thus offset geographical disadvantages. The order, therefore, is that the carriers may charge only 10¢ more per ton to shippers from the Johnsonburg and Johnstown groups over the Clearfield rate as reduced in 1936; 15¢ additional to producers in the Connellsville group and 20¢ to shippers in the Pittsburgh group. As we understand the record, no effort has been made to ascertain in any way the value of the additional service; for instance, what the transportation of a ton of fire brick for the additional distance of 133 miles between Merrill and Clearfield is worth.

We do not understand that it is within the power of regulatory bodies to prescribe rates for the primary purpose of enabling competing shippers to market their product or to neutralize the geographical disadvantages of producers. In *U. S. v. Ill. Cent. R. Co.*, 263 U. S. 515, 524, Mr. Justice BRANDEIS said: "It is true that the law does not attempt to equalize opportunities among localities, ......, and that the advantage which comes to a shipper merely as a result of the position of his plant does not constitute an illegal preference ......., In other words, the difference in rates cannot be held illegal, unless it is shown that it is not justified by the cost of the respective services, by their values, or by other transportation conditions." See also *Texas and P. Ry. Co. v. U. S.*, 289 U. S. 627, 637; *Pennsylvania*

*R. R. Co. v. P. S. C.,* 126 Pa. Superior Ct. 1, 190 A. 372, and *Southern Pac. Ry. Co. v. I. C. C.,* 219, U. S. 433.

Another feature of the order which seems to us to lack justification in the evidence is the extent of the dislocation which it creates between interstate and intrastate rates. The evidence indicates that complainants have, in the language of one of their witnesses, "no complaint with the fire brick structure sanctioned by the Interstate Commerce Commission," and that large shipments of the product in question are constantly moving under interstate rates from Merrill, St. Marys and other points of origin here involved. Considerable quantities of fire brick are delivered to points in eastern Pennsylvania from origins in Maryland, Ohio, etc., under the interstate adjustment. Wellsville, Ohio, is a point in the Pittsburgh group and shipments from Wellsville into eastern Pennsylvania are comparable with shipments from Pittsburgh. The differentials which the commission says it has reestablished are those fixed by the federal commission in the "General Brick" case, but the present order seems to overlook the fact that the relationship established by the federal commission had as its base the key rate from Pittsburgh to New York and not the Clearfield rate. Under the evidence, Wellsville is 18 miles west of Merrill, Pa. The interstate rate from Wellsville to Philadelphia points is $3.80, but the present order establishes a rate of only $3.05 to the same points from Merrill. Another illustration from the evidence is that Thornton, West Va., in the Connellsville group, is only 2 miles farther from the Philadelphia group than is Connellsville, Pa. The interstate rate from Thornton to the Philadelphia group is $3.75, but the order of the commission fixes a rate from Connellsville of only $3.

A comparison of existing interstate group rates, as adjusted by the federal commission, and intrastate group rates, as fixed by various orders of the state com-

mission (including the order of November 25, 1936), may be thus stated:

| From | To Philadelphia Inter-state | To Philadelphia Intra-state | To Baltimore Inter-state | To Baltimore Intra-state |
|---|---|---|---|---|
| Pittsburgh .... | 3.80 | 3.35 | 3.60 | 3.15 |
| Connellsville .. | 3.75 | 3.30 | 3.55 | 3.10 |
| Johnstown .... | 3.70 | 3.25 | 3.50 | 3.05 |
| Clearfield ..... | 3.60 | 2.85 | 3.40 | 2.40 |

If the order now before us should be affirmed these further reductions in intrastate rates would result.

| From Pittsburgh | To Philadelphia 3.05 | To Baltimore 2.60 |
|---|---|---|
| Connellsville | 3.00 | 2.55 |
| Johnstown | 2.95 | 2.50 |
| Johnsonburg | 2.95 | 2.50 |
| Clearfield | 2.85 | 2.40 |

It is apparent from what has been said that prior to the state commission order of 1936 there was an harmonious relation between interstate and intrastate rates, and equally evident that the present commission by the order now appealed from has materially extended the disruptive effect of the order of 1936 and made Clearfield the base point for the calculation of differentials over its rate instead of Pittsburgh for calculating differentials under its key rate.

When consideration is also given to the effect of the order upon destination groups it is apparent that the dislocation between interstate and intrastate rates is equally great. The rate from the Pittsburgh group to destinations such as Camden, New Jersey, and Wilmington, Delaware, within the Philadelphia destination group, would remain at $3.80, but the rate to Philadelphia would be $3.05; to points in the Baltimore group beyond the Pennsylvania line the rate would be $3.60, and to points on the Pennsylvania side of the line only $2.60.

We are of opinion that it is the duty of a state com-

mission not only to fix rates which are just and reasonable for intrastate traffic but also to give consideration to the effect upon interstate traffic which will result from the order of a state commission. It is not our function to determine what rates will be "just and reasonable" within the meaning of Section 301 of Art. III of the "Public Utility Law" of May 28, 1937, P. L. 1053, 66 PS §1141, but to determine, under Section 1107 of Art. XI, 66 PS §1437, whether the order of the commission is erroneous, as a matter of law, or without support in the evidence.

We realize that the subject matter of this appeal involves highly technical problems within the administrative jurisdiction of the commission, and that there is necessarily a sharp divergence in the point of view of the producers who are chiefly interested in the maintenance of a proper relation of rates and that of the consumers who pay the freight and are primarily concerned with the rate level.

But our review of this record has led us, for the reasons indicated, to the conclusion that the order of January 10, 1938, is so unreasonable and violative of legal principles as to require its reversal.

Order reversed. Costs upon this appeal to be paid one half by the Commission and one half jointly by the Complainants.

BALDRIGE, J., took no part in the consideration or disposition of this case.