New York Central Railroad Company, Appellant,
*v.* Pennsylvania Public Utility Commission.

Argued September 17, 1959. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (RHODES, P. J., and HIRT, J., absent).

*John A. Daily,* of the New York Bar, with him *W. M. Ruddock, John S. Simpson,* and *Fisher, Ruddock & Simpson,* for appellant.

*Miles Warner,* Assistant Counsel, with him *Thomas M. Kerrigan,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*David Dunlap,* for complainant, intervening appellee.

OPINION BY ERVIN, J., November 11, 1959:

This is a rate case. By certain tariffs published to become effective December 21, 1957 and December 27, 1957, the appellant, New York Central Railroad Company (hereinafter called "Central"), provided for increases in rates on bituminous coal, said rates applying generally for the transportation of coal to the electric utility plant of the Pennsylvania Electric Company (hereinafter called "Penelec") at Shawville, Pennsylvania, from mines within a radius of approximately 20 miles. After the tariffs had been published but before the increased rates had become effective, Penelec filed its complaint, alleging that the proposed increased rates were excessive, unjust, unreasonable and unjustly discriminatory. On February 9, 1959, after hearings held before the commission, an order was entered cancelling the rate increase and stating that an order awarding reparations, with interest, would issue upon proof of the amount of the rate increase actually paid by Penelec. On or about February 28, 1959 Central petitioned the commission for a reopening of the record, further hearing, reargument and supersedeas. On April 20, 1959 the commission denied the petition and this appeal followed. On June 4, 1959 we permitted Penelec to interevene and on June 8, 1959, upon the

stipulation of all the parties, we granted a super-sedeas.

Penelec's plant is located at Gray station, approximately 6.7 miles east of Clearfield on Central's river line. The coal is loaded into railroad hoppers at mines located within a radius of 20 miles from the plant. The district involved is a bituminous coal mining area located mostly in Clearfield and Centre Counties but reaching westward into parts of Cambria and Indiana Counties as well. Five mine-run local trains are operated in handling this traffic. The movement takes place in either 55-ton or 70-ton hopper cars. Approximately 75% of the cars used in this operation were from foreign roads for which Central paid a per diem charge of $2.75 per car per day. The empties are brought into the district from Central's main line at Avis, where they are classified for distribution to the mines in the area. Ninety per cent of the loaded cars go back through Avis for main line carriage to eastern seaboard markets. Avis may be likened to the neck of a bottle and the district may be thought of as the rest of the bottle. Ten per cent of the cars are temporarily diverted to Penelec's service within the bottle before being loaded for the seaboard. To illustrate this temporary diversion: an empty car picked up by a local at Avis moves westward 75 miles to the mine of one of Penelec's coal suppliers at Mowry; after loading it moves 18 miles farther west to the Penelec plant, where it is unloaded. After its release by Penelec the empty car continues westward to a non-Penelec mine for loading and the loaded car moves eastward to Avis and on to the seaboard. It also happens that a car may make more than one loaded trip from a mine to Penelec before it leaves the area. The number of cars delivered to Penelec from day to day, five days per week, is fairly uniform. The coal requirement per

day is about 50 cars or 3,000 tons, and this quantity permits an accumulation in Penelec's bunkers to carry through Saturday and Sunday.

Penelec's Shawville plant commenced operation early in 1954. Prior to the commencement of operations, rate negotiations were carried on between Central and Penelec with reference to coal to be hauled from the nearby mines to the new plant. Central was informed that Penelec intended to purchase the Shawville plant's coal supply from mines within 20 miles of the plant and that they were in possession of some very low truck rates. Penelec requested the establishment of specific per-car rates to the plant. On February 18, 1954, in Tariff Pa. P. U. C. No. 263, such rates were established on the basis of different zones with the scale ranging from $12.00 to $21.00 per car. Effective March 7, 1956 these rates were increased by 6% under Ex Parte 196. Effective December 28, 1956, Ex Parte 206, a flat increase of $5.00 per car was added. Effective August 26, 1957, at Ex Parte 206-A, an additional $2.50 per car was added. Immediately prior to the effective dates of the tariff here at issue the range of $12.00 to $21.00, by reason of these ex parte increases, had become $20.22 to $29.76. The tariffs herein complained of increased this range to $32.00 to $48.00 in addition to establishing rates for a number of new origins. While this proceeding was before the commission a further increase, effective February 15, 1958, of $5.00 per car was allowed under Ex Parte 212.

Penelec's complaint is directed against the increases included in tariffs filed to be effective December 21 and 27, 1957. The complaint does not encompass the Ex Parte 212 increases of February 15, 1958 of $5.00 per car. The effect of the rate increase of December 21, 1957 to Penelec is summarized in the following table:

Effect of Rate Increase of Dec. 21, 1957
Applied to Shawville Plant Coal Shipments
for the Years 1956 and 1957

|  | Year 1956 | Year 1957 |
|---|---|---|
| Number of cars | 12,565 | 11,063 |
| Avg. tonnage per car | 62.62 | 61.65 |
| Total tonnage | 786,879 | 682,073 |
| *Freight Charges* | | |
| At increased rates—incl. X-212 | $604,275 | $524,274 |
| At rates in effect 12-20-57 plus X-212 increase | 406,570 | 352,724 |
| Effect of increase of 12-21-57 | $197,705 | $171,550 |

The train crews in this area receive the highest rate of pay for mine runs on Central. Because of the nature of the work done, considerable overtime is incurred. Occasionally an additional local must be run in order to finish up the work when the crew on a regular local reaches its hours-of-service maximum.

### COMPARATIVE RATES

Central offered into evidence four exhibits of published rates for the transportation of bituminous coal. The evidence reveals that all of these rates were "paper" rates, i.e., rates under which no hauls occur, with one minor exception. The exception covered a haul of eight cars per day of refuse coal from a coal cleaning plant to Rochester and Pittsburgh Coal Company's electric plant at Lucerne Mines. While we did say in *Pa. Railroad Co. v. P. S. C.*, 126 Pa. Superior Ct. 1, 10, 190 A. 372, that ". . . the fact that traffic does not move is not conclusive that the rates are not reasonable.", we are inclined to agree with the commission's

conclusion in the present case that these "paper" rates are valueless. No evidence was presented to show that any of these rates had ever been litigated and found to be just and reasonable. Since no shipper actually takes service under them, there would be no occasion for litigation. As long as there are no takers of the service, the railroads may set the rates as high as they choose and change them at will without any risk that the rates will be tested by litigation and without any effect on revenue. This evidence would support an inference that all of these rates are too high to compete successfully with motor trucks. In view of the fact that these rates have not attracted any business, it may be fairly inferred that the rates are not reasonable. We can find no error in the commission's finding that these "paper" rates were valueless.

### COSTS OF SERVICE

Central's cost evidence is based on four different factors: car hire, road crew costs, other operating expenses and a measure of return. A survey of the movement was conducted during the period January 1 to September 30, 1956. The two major direct expense items were road crew wage costs and car hire costs. The road crew wage costs were calculated by taking an every-fourth-day sample of the length of the trains involved. Since the length of the train determines the wage rates, the wage costs for each train were calculated for each of the members of the crew. The average time worked by the crews was determined from the actual train sheets. The average wage costs determined in the every-fourth-day sample were then applied to all train movements for the nine-month period. The amount of these expenses attributable to Penelec traffic was apportioned on the basis of cars handled for Penelec as compared with the total cars

handled on these trains. The Penelec portion, as adjusted to reflect 1958 wage levels, was $56,888.00.

The next major factor is that of car hire expense. During the 1956 study period, 78.4% of the cars used in Penelec traffic were foreign owned. In 1956 Central paid the owning railroad $2.40 for each day the car was on the Central's line. In 1958 the rate was $2.75 per day. Since approximately 75% of the cars used on this traffic were foreign owned in 1956 and 1957, the car expense was priced out as though all cars used were foreign owned. We see nothing wrong with this procedure because "The per diem rate . . . is in the nature of a reciprocal charge. . . . It is intended to reflect the average cost to the owner of freight-car ownership and maintenance." Rules for Car Hire Settlement, 160 ICC 369, 378. An actual study of the operation covering 377 cars showed an average turn-around time of 6.7 days. The time is calculated from arrival of the empty at Avis until release at Penelec for unloading. Penelec argues that it is penalized for the car delays at Avis. The commission, however, after excluding car delays for repairs at Avis, concluded that the proper amount of expense would be 9,297 cars x 5.6 days x $2.75 or $143,173.00, instead of the sum claimed by Central of $178,967.00, which was based upon a seven-day turn-around factor.

There are four major indices of work performed by the railroad: gross ton miles (the movement of one gross ton for one mile) ; car miles (the movement of a car for one mile) ; net ton miles of revenue freight (the movement of one ton of revenue freight for one mile) ; and train miles (the movement of a train for one mile). The number of each such units produced on Penelec traffic was then compared with the total of such units produced on the railroad. The resulting ratio was then applied to the system expenses, exclud-

ing road crew and car accounts, to determine the proper amount attributable to Penelec. Central used the car-mile method as it deemed that to be the most accurate since that is the primary work unit performed in this case and covers both the empty and loaded movements. This showed Penelec's portion of other expenses (such as maintenance of track and right-of-way, maintenance of locomotives, signal systems, etc.), increased to 1958 cost levels, to be $143,907.00.

### Summary of Above Calculations

| | |
|---|---|
| Road crew costs | $ 56,888.00 |
| Car Hire (9,297 x 5.6 x $2.75 | 143,173.00 |
| cars days car cost per day | |
| Other expenses (car-mile method) | 143,907.00 |
| Total | $343,968.00 |

The testimony of Central's cost witness bases the revenue need figures on the amounts which would have been necessary to secure the average net profit here as secured on all traffic, a profit-to-expense ratio culminating in a return on the railroad's net investment in 1956 of 2.96%. In 1956, the railroad had freight operating expenses which amounted to 70.69% of its freight revenues. By applying this same ratio to the expenses of Penelec's traffic, the latter is expected to contribute the average amount contributed by all other traffic for the railroad's overhead expenses and return on investment. In other words, coal is required to contribute in relation to the average contributed by all other traffic. The application of the 70.69% factor to the total of the three expense factors hereinbefore established results in a total revenue need of $484,789.00. The total revenues for the nine-month study period in question at 1958 rate levels, including the increase of December 21, 1957, amounts to $441,-

404.00. Without the increase in question the nine-month revenues on Penelec traffic at 1958 rate levels would have been $303,504.00. The commission, in its order, pointed out that if the per diem expense for car hire contained an amount for return on investment in cars, Central's method of calculating the amount necessary for overhead and net would include an element of duplicate return. The commission was undoubtedly right in this observation. The record does not contain a breakdown of the $2.75 per diem car charge but does contain one for the 1956 per diem figure which shows that 80% of the $2.40 total car hire figure or $1.90 is for depreciation, repairs and taxes. The application of the 80% figure to the 1958 per diem figure of $2.75 results in an expense figure of $2.20. Calculated on a turn-around time of 5.6 days and using the per diem car hire figure of $2.20 per day, the total car hire expense would be $114,-539.00. Giving full effect to these criticisms, a summary of the expense figures would be:

| | |
|---|---|
| Road crew wage | $ 56,888.00 |
| Car hire | 114,539.00 |
| Other expenses | 143,907.00 |
| | |
| Total | $315,334.00 |

Without the increase here in question, the 1958 revenue would be $303,504.00. This leaves out of consideration any sum for return on investment. If this were all that had to be considered in this case, we would feel obliged to exercise our prerogative and make our own independent findings from the evidence in this record. In *Duquesne Light Co. v. Pa. P. U. C.*, 176 Pa. Superior Ct. 568, 578, 107 A. 2d 745, we said: "It is only where the utility appeals on the ground of confiscation that we may make independent findings. Otherwise we are bound by the findings made

by the Commission if there is evidence to support them, and if they support the Commission's order." See also *Solar Electric Co. v. P. U. C.*, 137 Pa. Superior Ct. 325, 353, 9 A. 2d 447; *Schuylkill Val. Lines, Inc. v. P. U. C.*, 165 Pa. Superior Ct. 393, 397, 68 A. 2d 448.

The commission did not give any weight to the cost evidence produced by Central and failed to make adequate findings relative to the items of costs hereinbefore referred to. The making of detailed findings is not the only duty the commission failed to perform. Under the Public Utility Law, the commission had the further duty to determine the just and reasonable rates to be charged. No effort was made by the commission to perform this duty. *Peoples Natural Gas Co. v. Pa. P. U. C.*, 141 Pa. Superior Ct. 5, 13, 14 A. 2d 133. What the commission did do was to suggest that Central might have been able to render its service to Penelec for lower costs if it had kept a specific number of cars within the district for the exclusive use of Penelec. A witness for Penelec testified that Penelec's needs could be satisfied by a pool of 150 cars; that would provide for 50 cars at the plant, 50 at the mines and 50 en route. The commission then said: "The assignment of a pool of cars for Penelec's operations; i.e., wholly within the district, would change the cost bases and the allocation factors used by respondent. This could affect each group of expenses. . . ."

Central now argues that the commission did not have the power to require a change in the service because no complaint had been filed nor was there any investigation pending by which the service was questioned. It argues that a public utility has the right to manage its own affairs and that it is not within the province of the commission to interfere unless the utility is not properly serving the public. In our view of the matter, the commission was not telling Central

that it had to change its service, it was merely suggesting that if it had used a pool of cars, the costs of service might have been lower. Certainly the commission not only had the power but it also had the duty to make any reasonable suggestions to the utility which might improve the service or result in lower costs of such service to the public. These are matters which directly affect the public interest, over which the commission has broad powers. That the commission's suggestion was reasonable is borne out by the evidence in the record to the effect that Central had at one time assigned a car pool to the exclusive service of Penelec. Central petitioned for further hearing, offering to prove that the costs of a car pool would also justify the increased rates. The additional evidence sought to be adduced, part of which covered a period subsequent to the close of the oral hearings, was clearly set forth in the petition. The commission refused further hearing. This we think constituted an error of law as that phrase is used in §1107 of art. XI of the Act of May 28, 1937, P. L. 1053, as amended, 66 PS §1437, particularly where the appellant alleges confiscation. We will, therefore, remand this record to the commission so that the interested parties may present evidence pro and con on the costs of a car pool. Inasmuch as the record is to be remanded and further hearings held by the commission, we feel that any interested party should have the opportunity to present any further evidence of costs of operation which it might care to submit. After the evidence is concluded the commission should make specific findings of fact on the several items of cost and then should determine whether the proposed rates are fair and reasonable.

The order of the commission is reversed; the record is remanded for the taking of such additional testimony as may be necessary and for the making of ad-

ditional findings in accord with this opinion. Each party to pay the cost of printing its own brief; the cost of printing the record to be equally divided between Central and Penelec.