Pennsylvania Railroad Company, Appellant, *v*.
Pennsylvania Public Utility Commission.

6

Argued October 11, 1938.

Before KELLER, P. J., CUNNING-
HAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Windsor F. Cousins,* for appellant.

*Samuel Graff Miller,* with him *Edward Knuff* and
*John C. Kelley,* for appellee.

OPINION BY PARKER, J., March 3, 1939:

On this appeal we have for review an order of the
Public Utility Commission finding that existing rates
for the transportation of sand in carloads in open top
cars from Tatesville to points in this state within a
radius of two hundred miles are unjust and unreason-
able and prescribing a new tariff. By section 1107 of
the Public Utility Law, Act of May 28, 1937, P. L. 1053
(66 PS §1437), it is provided that "the order of the
commission shall not be vacated or set aside, either in
whole or in part, except for error of law or lack of
evidence to support the finding, determination, or order
of the commission, or violation of constitutional rights."
We are all of the opinion that the order must be reversed

since it is not supported by the evidence produced and is not in conformity with law.

This proceeding was initiated by a complaint of the Pittsburgh Silica Sand Company filed with the Public Service Commission (now Public Utility Commission) against Huntingdon and Broad Top Mountain Railroad and Coal Company (hereinafter referred to as Broad Top) and the Pennsylvania Railroad Company. Broad Top is 44 miles in length with its termini at Huntingdon on the north and Mt. Dallas on the south. At each of these points it connects with lines of the Pennsylvania Railroad Company. The pleading set forth that the complainant was operating a plant for the production of sand at Tatesville, Pennsylvania, on the line of Broad Top, four miles north of Mt. Dallas; that its products were principally shipped over the lines of the Broad Top and the Pennsylvania Railroad Company under a joint tariff; that it shipped but a small portion of its products to points of destination on Broad Top and that its markets were principally on the lines of the Pennsylvania Railroad Company; that the existing tariff allowed an "arbitrary" of twenty cents per ton to be added to the base rates for all joint-line hauls; that its competitors were located at Mapleton, Foxburg, Daguscahonda, and Pittsburgh, all on the lines of the Pennsylvania Railroad Company, with their points of destination principally on that same road, and in meeting the competition of rival companies, who marketed their products over a single-line haul, the complainant was severely handicapped with the result that the rates charged were, and would be in the future, unjust, unreasonable, and unduly preferential to its competitors and in violation of the Public Service Company Law.

The rates attacked by the complainant were fixed by the carriers in accord with a scale of rates known as the Lycoming scale, first prescribed by the Public Service Commission in *Lycoming Silica Sand Co. v. Allegheny &*

*S. S. Ry. Co.,* 9 Pa. P. S. C. 298 (1928), wherein the commission adopted rates fixed in 1928 by the Interstate Commerce Commission for shipments originating in Pennsylvania, such rates being known as the Buckland scale (*Buckland v. B. & A. R. R.,* 139 I. C. C. 88). The Lycoming case dealt with rates on common sand, gravel, and crushed stone shipped in open cars and prescribed substantial reductions from the rates theretofore existing. Under a practice generally adopted in interstate and intrastate commerce, the complainant's product, industrial sand, was included in the same classification as common sand.

It is necessary to refer to other scales as they are commented on in the proofs and the opinion of the commission. In western Pennsylvania a similar system of rates was adopted and is known as the Davison scale (*Davison v. P. R. R. Co.,* 8 Pa. P. S. C. 658 [1927]), or West Penn scale (*Penna. S. & G. Prod. Assn. v. B. & O. R. R. Co.,* 104 I. C. C. 717).

The dividing line between the fields of the two scales is, roughly, the Allegheny Mountains, fixed specifically, however, by the Interstate Commerce Commission as a line running north and south through Cumberland, Maryland, with the Lycoming scale applied on the east (*Industrial Sand Cases,* 188 I. C. C. 99, 104). Tatesville and Mapleton each lie east of that dividing line. The Pennsylvania commissions have consistently applied the Lycoming scale.[1] The Ohio scale was pre-

---

[1] *York Valley Lime & Stone Company v. P. R. R.* 9 Pa. P. S. C. 310 (1928); *Everett-Saxton Co. v. B. & O. R. R. Co.,* 9 Pa. P. S. C. 388, (1928); *Peerless Sand Corp. v. Allegheny & S. S. Ry. Co.,* 9 Pa. P. S. C. 726 (1929); *National Plate Glass Co. v. P. R. R.,* 9 Pa. P. S. C. 693 (1929); *Pennsylvania Glass Sand Corp. v. Allegheny & S. S. Ry. Co.,* 10 Pa. P. S. C. 60 (1929); *Bellefonte Lime Co. v. N. Y. C. R. Co.,* 10 Pa. P. S. C. 119 (1929); *Colonial Iron Co. v. H. & B. T. M. R. & C. Co.,* 10 Pa. P. S. C. 200 (1930); *Blair Cambria Sand Co. v. Allegheny & S. S. Ry. Co.,* 10 Pa. P. S. C. 273 (1930); *Susquehanna Stone Co v. P. R. R.,* 10 Pa. P. S. C. 276 (1930); *Stahl National Lime Stone Quarry v. P. R.*

scribed by the Interstate Commerce Commission (*Rates on Crushed Stone, Gravel, Sand, and Slag in Ohio,* 191 I. C. C. 206 [1933]). That scale applied to interstate shipments from origins in Pennsylvania west of the north and south line drawn through Cumberland, Maryland, to destinations in Ohio, Indiana, Michigan, and Wisconsin, and embodied one level of rates for application to both single and joint-line movements of sand. The Lycoming joint-line scale is 107.4 per cent of the West Penn joint-line scale and 123.7 per cent of the Ohio scale.

The requirement in the statute that the reviewing court shall determine whether the evidence supports the finding involves two steps, a determination as to whether the evidence supports the primary findings of fact and whether these preliminary facts support the ultimate finding and order. It is the duty of the commission to harmonize contradictory evidence or determine where the truth lies. "In creating such an administrative agency, the Legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined, and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective": *Panama Refining Co. v. Ryan,* 293 U. S. 388, 432, 55 S. Ct. 241, 253. "Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting

R., 10 Pa. P. S. C. 727 (1931); *Miller v. P. R. R.,* 11 Pa. P. S. C. 190 (1931), 21 P. C. R. 27; *Pennsylvania Glass Sand Corp. v. P. R. R.,* 13 Pa. P. S. C. 691 (1935).

forth the reasons on which they base their decisions in cases analogous to this": *Beaumont, S. L. & W. Ry. Co. v. U. S.*, 282 U. S. 74, 86, 51 S. Ct. 1.

It requires a very careful study of the opinion of the commission to determine precisely what facts were intended to be found. Considerable space is devoted to a statement of the testimony produced on each side without a specific finding as to what conclusion was reached by the commission as to some basic facts. In *U. S. v. Chicago, M. St. P. & P. R. Co.*, 294 U. S. 499, 510, 55 S. Ct. 462, the late Mr. Justice CARDOZO, with his usual clarity, thus commented upon a similar situation: "The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi jurisdictional findings of an administrative agency ...... We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

In brief, the complainant alleged that the rates in force were unjust and unreasonable with respect to the "arbitrary"; that is, because it was required to pay more for a joint-line haul than some competitors were required to pay for a single-line haul. No complaint was made as to the base rates. In support of unfairness it alleged that it could not compete with its business rivals and then referred to competition at four shipping points where competitors were able to deliver sand at less transportation cost than the complainant could, and stated further that it had practically no market for its commodity as its shipments were limited to points of destination on Broad Top. This, of course, does not of itself show a preference or discrimination, as we shall later show. In general the complaint was vague and unsatisfactory.

In the proofs with relation to competition at the

four points mentioned, the proofs were within even narrower limits. The commission found: "No sand has been produced at Foxburg for several years, and that produced at Daguscahonda is not sold in competition with complainant's sand. The allegation that the producers of sand in the Pittsburgh area are competitors of the complainant was withdrawn at the hearing." The specific proofs with reference to competition were largely confined to a comparison with the operations at and transportation charges from Mapleton and Tatesville.

We summarize the commission's findings and order by extracts from its report as follows: "The difficulties of complainant's position are apparent from consideration of the fact that to the majority of destinations the distances from Mapleton are two miles less than from Tatesville via Mt. Dallas while the rates are 20c higher from Tatesville. This route is generally used to destinations in western Pennsylvania. To destinations such as Clearfield and Lock Haven the traffic is routed via Huntingdon and the distances are 25.7 miles greater from Tatesville. The rates from Tatesville on traffic routed via Mt. Dallas are in all cases 20c higher than the rates from Mapleton, and when routed via Huntingdon they are 30 and 40c higher." The report then calls attention to the fact that since the West Penn scale is lower than the Lycoming scale, freight may be shipped east at a lower rate than it can be shipped in a westerly direction but adds a self-evident comment: "This situation is bound to exist, however, for the Lycoming joint-line scale is 30c higher for the same distances than the West Penn single-line scale. The application of the 20c differential has the effect of adding 40 miles to complainant's distances or two mileage blocks in the scale ...... The average rate of the West Penn joint-line scale is 122.5 cents, of the Ohio scale 105.3 cents, and of the Lycoming joint-line scale 131.5 cents. The Lycoming joint-line scale is 107.4% of the

West Penn joint-line scale and 123.7% of the Ohio scale."

The report then deals with that part of respondents' proofs which was intended to show the extra cost to the carriers of joint-line hauls over single-line hauls and concludes that while considerable extra cost is entailed it should not be borne alone by the customers using joint-line service but should be distributed among all patrons of the carriers without regard to location. We quote from the report: "The Lycoming single and joint-line scales are generally applied from producing points in eastern Pennsylvania ...... The complainant has no markets on the Broad Top, hence it must market all of its product at freight rates which are 20c per ton higher than the rates from Mapleton ...... The arbitrary of 20 cents was adopted as somewhat of an average. That it is not practical has been proved by experience." The final conclusion of the commission was that a rate should be fixed for freight moving from Tatesville so that the charges will bear the same general relation to the Lycoming scale as the Ohio scale bears to the West Penn scale. It then prescribed a new tariff for joint-line hauls by adding either nothing, five cents, or ten cents to, or subtracting five cents from, the rate fixed by the Lycoming scale for the different distances from five to two hundred miles and eliminated the "arbitrary".

The Public Utility Law, §312 (66 PS §1152), provides in part as follows: "In any proceeding upon the motion of the commission, involving any proposed or existing rate of any public utility, or in any proceeding upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility." As this proceeding was instituted by Pittsburgh Silica Sand Company and did not involve a proposed increase in rates, the burden was, as theretofore, upon the claimant to sustain the charges made: *B. & O.*

*R. R. Co. v. P. S. C.*, 66 Pa. Superior Ct. 403, 406; *Duquesne Light Co. v. P. S. C.*, 77 Pa. Superior Ct. 8, 13, 273 Pa. 287, 293, 117 A. 63.

The rate attacked in this proceeding was in conformity with the Lycoming scale which the Interstate Commerce Commission and the state commission had prescribed in a large number of cases. As we pointed out in *Cheltenham & Abington S. Co. v. P. S. C.*, 122 Pa. Superior Ct. 252, 264, 186 A. 149, when rates have been actually approved by the commission it follows with greater force that those findings formerly made are assumed to be fair, just, and reasonable in the absence of proofs to the contrary. In *Penna. R. R. Co. v. P. S. C.*, 126 Pa. Superior Ct. 1, 8, 190 A. 372, we said: "We think it may properly be remarked that it [appellant] had the advantage of a presumption in favor of the reasonableness of maintaining the Birmingham rate. It is in harmony with the Buckland-Lycoming scales. Not only did the Interstate Commerce Commission specifically find the Buckland scale rates from Birmingham to be reasonable in the proceeding before it, but our own commission has repeatedly applied the Lycoming Scale." As the claim made here is discrimination or undue preference—the base rate is not attacked—there is greater reason for placing the burden of proof on complainant.

We not only do not find any evidence supporting the conclusion of the commission, but such evidence as is found in the record is to the contrary, the legal reasons given are not sound, and the conclusion reached is unreasonable, contrary to law, and violative of the respondents' constitutional rights. The effect of the commission's order is to single out one patron for special treatment on the ground of an alleged faulty rate scheme and at the same time afford to the complainant the very preference of which it complains where the competitor must have access to a joint-line haul. This can only lead to a succession of complaints.

As we feel there is basic error here we desire, before considering further the real merits of this appeal, to advert to the prior treatment of this subject by the Interstate Commerce Commission and the state commission, with particular reference to the contention of the respondents that it is the action of the Public Utility Commission that is, in fact, arbitrary and discriminatory.

In *Industrial Sand Cases,* supra, the Interstate Commerce Commission called attention to the fact that in seven named cases they had applied the Buckland (Lycoming) scale to shipments from origin points east of a north and south line drawn through Cumberland, Maryland, and that the Pennsylvania Public Service Commission had done likewise in numerous cases, while each commission had applied the West Penn scale from origin points west of that dividing line. In that case rates on industrial sand from both Tatesville and Mapleton were involved. The Buckland scale was adopted. The twenty cents "arbitrary" was allowed in both the Lycoming scale and the West Penn scale.

In *Peerless Sand Corp. v. Allegheny & S. S. Ry. Co.,* 9 Pa. P. S. C. 726, shipments were involved from Brumbaugh, a point on Broad Top, and the Lycoming scale with the twenty cents "arbitrary" was prescribed, and on appeal the order of the commission was affirmed by this court: *American Lime & Stone Co. v. P. S. C.,* 100 Pa. Superior Ct. 158. That scale with the "arbitrary" was likewise applied on shipments of slag from Burnham to Riddlesburg, a point on Broad Top, both points being east of the Cumberland line. In *Blair Cambria Sand Co. v. Allegheny & S. S. Ry. Co.,* 10 Pa. P. S. C. 273, the same scale with "arbitrary" was applied to shipments of sand and gravel from Frugality, a point farther west than Tatesville. Not only so, but complainant's own expert testified: "To be frank with you, Mr. Cousins, I don't know of any case [in the Lycoming territory] where the rates today for Joint Line

Hauls [of sand] are less than the 20c arbitrary." The Pennsylvania commission did in one case attempt to depart from the Lycoming scale and the order in that case was reversed by this court: *Penna. R. R. Co. v. P. S. C.*, supra. Under such circumstances it is a heavy burden that rested on the complainant.

Coming to the matter of competition at Mapleton, the commission states that the natural market for the complainant's commodity is at points in western Pennsylvania and, by reason of the fact that some of its business rivals may ship to some of those points by a single-line haul while it must pay twenty cents per ton "arbitrary" and because it has no market on the line of Broad Top, it cannot do business. The commission then draws this conclusion: "It is evident that the 20c per ton difference in its rates is the reason. Such a barrier to a shipper is unfair ...... The arbitrary of 20 cents was adopted as somewhat of an average. That it is not practical has been proved by experience." It will be noted that there are two prime facts upon which the commission predicates its conclusion; to wit, that the complainant is unable to transact business by reason of the differential of twenty cents and that the "arbitrary" of twenty cents is not practical. There are no supporting facts in the record for the conclusion that the "arbitrary" is not practical or is unreasonable or discriminatory unless it be the finding that it cannot compete. To sustain the other finding of fact the commission depends upon evidence showing a comparison of the conditions and transportation charges for industrial sand shipped from Mapleton and Tatesville to various points of delivery in western Pennsylvania.

If the so-called "arbitrary" is not practical or is unsound or unreasonable, it must be admitted that a change should be made, but what that change shall be can only be determined when the facts are placed on the record. The premise is not supported by any

evidence in the record; it is a mere assertion without facts to support it and it is made in the face of much indisputable evidence which could only lead to a contrary conclusion. As we have pointed out, the Interstate Commerce Commission and the state commission have applied the Lycoming scale with the "arbitrary" universally as to shipments from points in the eastern part of Pennsylvania, and thereby placed upon the complainant a burden which must be sustained before it can have relief. It is obvious that the order appealed from will result in a breakdown of the interstate and intrastate rate structure for all of western Pennsylvania. This should not be done for the benefit of one shipper: *Duquesne Light Co. v. P. S. C.*, 273 Pa. 287, 296, 117 A. 63. This was the commission's own position taken in *American Lime & Stone Co. v. P. S. C.*, supra, in its argument before this court. We cannot ignore the effect the order will have on others.

Not only did the complainant fail to sustain the burden cast upon it, but there was much indisputable evidence all of which tended to show that the commission reached an incorrect conclusion.

The tariff prescribed here by the commission made no allowance for joint-line hauls as to certain distances and for the remaining distances an allowance was made which the respondents' evidence would indicate was insufficient. The respondents offered evidence tending to show that the extra cost of a joint-line haul was more than twenty cents per ton and the commission found in its report that joint-line hauls do entail extra expense but declined to find as a fact what that extra expense amounted to, saying in substance that they did not know. There was evidence of a very persuasive character tending to show that such cost was more than twenty cents per ton. This was disclosed by proof of the Lorenz formula devised by Dr. Lorenz, long connected with the statistical bureau of the Interstate Commerce Commission, by a survey of the Federal Coordi-

nator of Transportation, and by evidence of respondents' experts. While the commission in its report admits that there was an extra cost involved in a joint-line haul it refused to find what that cost amounted to, yet undertook to provide a tariff covering the situation. The commission found that the joint-line haul involves extra costs to the carriers and that they should be compensated on that account and then fixed a rate to cover such additional cost as they admit without evidence on the subject.

The effect of the order is to relieve an individual shipper located at Tatesville, Pennsylvania, from paying the "arbitrary" while the competitors more largely affected must pay that extra charge if they ship from the Lycoming district, or the West Penn, by a joint-line haul. This simply reverses the situation and grants a preference to Tatesville shippers over other shippers. It is true that as to certain shippers a higher rate per ton would be paid on shipments from Tatesville than shipments from Mapleton covering substantially the same distances. However, there are two parties to this controversy and they are not affected alike. We must consider the interests of the carriers as well as those of the shipper. If the twenty cents "arbitrary" is abolished, then in situations where the Pennsylvania Railroad Company receives $1.40 per ton for a haul of 175 miles on its own lines, at the same time it must make a joint-line haul from Tatesville for which it would receive $1.05 per ton by reason of the division of the tariffs between the two contributing railroads. That situation is not to be entirely disregarded.

Even though the complainant is under a disadvantage in rates, it does not follow that the prescribed rate is discriminatory. The charging of different rates for service rendered under different conditions is not unlawful: *Alpha Portland C. Co. v. P. S. C.*, 84 Pa. Superior Ct. 255, 270. As the Interstate Commerce Commission said in *Pacific P. C. Co. v. Director General,*

64 I. C. C. 507, 509: "The disadvantage complained of is one of geographical location. We have repeatedly held that we may not adjust rates to equalize natural advantages"; and in *Potomac Elec. Power Co. v. Chesapeake & O. Ry. Co.*, 152 I. C. C. 641, 651: "It is not within our power to adjust rates for the primary purpose of enabling competing shippers to market their product." The applicable law was summarized in a terse phrase by the late Justice HOLMES in *I. C. C. v. Diffenbaugh*, 222 U. S. 42, 32 S. Ct. 22: "The law does not attempt to equalize fortune, opportunities, or abilities." Rates are not unlawful merely because they retard the movement of traffic: *McCrady Bros. Co. v. P. & L. E. R. R. Co.*, 66 Pa. Superior Ct. 307, 313.

By way of argument, the commission relies in part on what it previously said and decided in *Industrial Silica Corp. v. B. & O. R. R. Co.*, 16 Pa. P. S. C. 122, 26 P. C. R. 5. The precise issue involved there and in the present proceeding was decided to the contrary by the Interstate Commerce Commission in *Industrial Silica Corp. v. B. & O. R. R. Co.*, 226 I. C. C. 173 (1938), and we need only refer to what was there said for answer to this argument.

To sum up our conclusions, we hold that the order appealed from is not supported by evidence in the record, is contrary to law, and is in violation of respondents' rights, more particularly in that (a) there is no evidence in the record supporting the conclusion that the twenty cents "arbitrary" is not practical; (b) respondents' property is taken without due compensation; (c) indisputable items of evidence are ignored; (d) the law was not properly applied in concluding that a rate was unfair or discriminatory merely because complainant could not compete with those who were more favorably located; and (e) it ignored the effect on interstate commerce which the federal authorities have undertaken to regulate and it upsets the whole rate structure for shipments of sand, gravel, slag,

etc., both in eastern Pennsylvania and in adjoining states where such foreign shippers market their product in Pennsylvania.

The order of the commission is reversed, costs to be divided equally between complainant and the commission.