## Philadelphia Suburban Water Company, Appellant, *v.* Pennsylvania Public Utility Commission et al.

Argued October 6, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Ernest R. von Starck,* with him *J. Wesley Oler, W. James MacIntosh* and *Morgan, Lewis & Bockius,* for Water Company, appellant.

*Albert E. Luttrell,* with him *Charles E. Thomas,* for Public Utility Commission, appellee.

*Allen J. Levin,* with him *Sundheim, Folz, Kamsler & Goodis,* for complainant, intervenor appellee.

OPINION BY DITHRICH, J., March 15, 1949:

The Philadelphia Suburban Water Company (hereinafter referred to as "Water Company") was ordered by the Public Utility Commission to provide single-point water meter service to the Colonial Gardens Corporation (hereinafter referred to as "Colonial") at its eleven-building apartment development in Yeadon, Delaware County, instead of under the contract theretofore in force between Colonial and the Water Company; according to the terms of which eight of the eleven buildings were carried on one meter and three were individually metered. The order was made after a hearing on a complaint by Colonial in which it sought to be classified as a "commercial" consumer of water within the meaning of the Water Company's tariff, and thereby have but a single meter for the entire group of apartments. From the order in favor of Colonial, the Water Company brought this appeal; Colonial joined as intervening appellee.

Colonial erected the eleven two-story buildings, comprising 186 apartments, in 1940, as a Federal Housing Administration project, financed by that agency. The apartment units themselves were duplexes, built one over the other; they were arranged into buildings of various sizes in order to avoid monotonous uniformity. All were erected on a single plot of ground owned by Colonial through which a private road was cut for the convenience of the tenants. The mortgage under which the project was financed covered the entire plot and all eleven buildings. The project was taxed as a single unit by the local real estate taxing bodies, had a single superintendent, and was supplied with gas and electricity under single-point meter service by the utilities providing those services. Colonial's vice president, who was the only witness called in support of the complaint, testified that the project differed from a single apartment house only in that the apartment units were grouped in separated

buildings of varying sizes, and that this separation was to provide light and air and grass around the dwellings and to avoid "a mechanical uniform outlook."

As the buildings were completed in 1940, they were supplied with water through individual meters, one to each building. It was brought to the attention of Colonial's officers (who were newly elected on a change of management in 1943) by the FHA that Colonial's water bills were almost double the amounts paid by comparable projects in other parts of the country, and Colonial then started a series of requests for single-point service that culminated in an agreement with the Water Company in February, 1944. Under this agreement, eight of the eleven buildings were put under single-point service, Colonial buying the water main under the private road cutting the plot, and paying the costs of installation of the single meter. The other three buildings were to continue on separate meters; the Water Company's officer stated that it was "impossible" to put them on a single-point service.

In violation of this agreement, Colonial placed all eleven buildings on the single meter. The Water Company objected, and Colonial then wrote to the Public Utility Commission, which advised Colonial to request the Water Company to cancel the individual contracts for service to the three buildings not included in the agreement for single-point service. Colonial did, on September 22, 1944, request the Water Company to cancel the contract, and offered to make a new agreement covering all eleven buildings, but no response was ever received to this letter. In April, 1946, Colonial applied for single-point service once again, using the Water Company's application forms, and was refused.

Colonial filed one complaint with the Commission in 1944, claiming refunds from the Water Company on account of improper metering and billing; this complaint was dismissed, the Commission noting that Colo-

nial was at that time taking water for the three buildings not covered by the agreement of February, 1944, contrary to the terms of that contract, contrary to the rules and regulations of the Water Company, and to the law. The complaint was not, however, dismissed on that ground, but on the ground that the refunds asked for were not called for under the then subsisting agreement between Colonial and the Water Company. It was expressly stated in the Commission's order that Colonial's right to single-point service for the entire development had not been made the subject of the complaint in that proceeding, and so was not passed on.

Colonial restored the separate meters for buildings 1, 2, and 3 in April, 1946, to conform to the agreement of February, 1944, after the Water Company had brought a suit in equity to compel restoration of the separate meters. Colonial then filed this complaint with the Public Utility Commission requesting that the Water Company be ordered to provide single-point service for all eleven buildings. The Commission determined (1) that Colonial was not barred from this relief by reason of having taken water for buildings 1, 2, and 3 through the single meter, in violation of the contract of February, 1944; (2) that Colonial was a "commercial" establishment entitled to single-point service under the Water Company's tariff; and (3) that a further hearing was necessary to settle the right of the Water Company to recover "undercharges" for water taken in violation of the agreement of February, 1944, and the right of Colonial to refunds for water supplied to buildings 1, 2, and 3 through separate meters after April, 1946, when Colonial's request for single-point service was denied.

Tariff Rule No. 17 of the Water Company provides as follows:

*"Property Supplied by Single Service Line:*

"17. A service line from the curb to a property shall not supply more than one property as generally de-

scribed and classified below; but any such property upon written request of the owner may be supplied by two or more meters, each of which for billing shall be considered as being one customer account, and provided that the supply to each such meter has an individual control at or near the curb, viz:

"(a) A dwelling house;—either detached, or one side of a double house, or a house in a row of houses; provided, that a garage, a conservatory and similar features incidental to the family life shall be considered a portion of the dwelling.

"(b) An industrial, or commercial, or manufacturing establishment.

"(c) A building separated from adjacent buildings by party wall or walls, and comprising apartments or stores or offices or any combination thereof.

"(d) A detached building comprising apartments or stores or offices, or any combination thereof.

"(e) A Housing Development owned and operated as a unit by the United States Government."[1]

The questions for determination are: (1) Did Colonial, by taking water for buildings 1, 2, and 3 through a single meter contrary to its contract with the Water Company, and by failing to pay the "undercharges" on such water as claimed by the Water Company, bar itself from the relief here sought? (2) Was the Commission's interpretation of the Water Company's tariff classification reasonable and supported by competent evidence?

The Commission, in its order nisi, stated: "There is no doubt that from May, 1944 until April 25, 1946, Colonial was taking water illegally and contrary to existing and controlling service contracts and has not to this day paid Suburban [the Water Company] the amounts demanded by Suburban as undercharges. We

---

[1] Since the development here involved is not owned and operated by the U. S. Government, but only financed by it, Colonial does not seek to have it considered under sub-paragraph (e).

feel, regardless of the fact that the matter is presently in litigation, Colonial should pay Suburban the amounts claimed. We do not feel, however, that non-payment of money damages should bar Colonial from the relief to which it might otherwise be entitled, particularly when we can condition any relief we may afford Colonial on the payment by Colonial to Suburban of the amount of the charges claimed by Suburban. Clearly, one who seeks equity must do equity."

Because the exact amount of the overcharges was not determined by the Commission in this proceeding, that question was ordered to be decided in a subsequent hearing at which Colonial's claim for damages from April, 1946, because of the Water Company's refusal to grant single-point service, would also be determined. Clearly this would provide the Water Company with all the relief necessary or otherwise available, and as Colonial points out in its brief as intervening appellee, after the controversy as to these conflicting claims would be settled, Colonial would be able to demand the relief sought for in this proceeding. Why the relief should be refused now because of Colonial's refusal to pay undercharges not judicially ascertained in amount, the Water Company does not suggest. It seems clear that the Commission did not abuse its discretion in entertaining the complaint at this time.

It is settled that the reasonableness of the classification and of the different rates applicable are administrative questions. *Brown v. Pennsylvania Public Utility Commission,* 152 Pa. Superior Ct. 58, 61, 31 A. 2d 435; *Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 447, 452, 15 A. 2d 473. So long as there is competent evidence to support the Commission's finding that Colonial's apartment development is a commercial establishment, the order cannot be disturbed.

The Water Company argues that the use to which Colonial's property is put determines that it is not "com-

mercial" within the purview of its Tariff Rule 17 (b), distinguishing "commercial" from "residential." Were Colonial's tenants the contracting consumers, rather than Colonial itself, the distinction would be apposite; as it is, however, Colonial is the consumer, and there can be no doubt that it is engaged in, and devoting its property to, a commercial enterprise. Only by a narrow construction of the word "commercial" could it be decided that the operation of an apartment development like Colonial's is not a commercial activity. In *District of Columbia v. Wardell*, 122 F. 2d 202 (Ct. of Appeals, D. C.), it was held that rents derived from the operation of an apartment house were derived from a "business" or "commercial activity" within the meaning of a revenue act taxing gross receipts from business or commercial activities. See also *Littlehales v. District of Columbia*, 130 F. 2d 402 (Ct. of Appeals, D. C.). Likewise, in *Pennsylvania Co. for Insurances on Lives and Granting Annuities, Trustee, v. Philadelphia*, 346 Pa. 406, 31 A. 2d 137, it was held that a corporate trustee operating, among other properties, an apartment house, was engaged in a "business, enterprise, activity or undertaking conducted for profit" within the meaning of a Philadelphia Income Tax Ordinance. The Supreme Court in that case recognized a distinction between small landlords and large apartment house operators, saying, page 414: "The classification recognized by the regulation is obviously intended to distinguish between properties commonly known as business properties and those commonly designated as homes or residences, including small apartment houses where the employment of no staff is required."

Clearly Colonial's project of 186 apartments could not be viewed as anything but a commercial establishment, so long as Colonial itself was the consumer which purchased the water. Certainly it was not unreasonable for the Commission to adopt a construction of the word

"commercial" which would embrace an enterprise of this scope.

Further, the evidence supports the finding here assailed; the testimony of Colonial's vice president is adequate to establish that there was a uniform use of the property for apartment dwellings, with uniform leases in which all utility services were covered by the rent, with common maintenance and supervision, common garage facilities, on a single tract mortgaged as a unit, taxed as a unit, and billed for utility services as a unit. Such a factual situation, under the decisions of this Court, establishes a case where single-point service is proper.

In *Land Title Bank and Trust Company v. Pennsylvania Public Utility Commission*, 138 Pa. Superior Ct. 544, 10 A. 2d 843, single-point service was denied, where the complainant operated an apartment project consisting of a large number of two-apartment dwellings variously financed and encumbered. Some of the buildings were occupied by "ownership certificate" holders specifying that they were entitled to the "exclusive ownership and occupancy" of their particular apartments, but under which the holders were required to pay complainant certain sums for taxes and water rent, but not electricity, which was the service there sought to be obtained at a wholesale rate. Other apartments were occupied by tenants of building and loan associations claiming through various trusts and mortgages. The Commission and this Court there concluded that the diversity of ownership precluded classification as a wholesale consumer. Combination of the various individual consumers in that case was not permitted; in this case, of course, there is but one owner—Colonial—and but one consumer—Colonial.

In *Hunter v. P. S. C.*, 110 Pa. Superior Ct. 589, 168 A. 541, the reasoning of which was followed by the Commission in its order, four adjacent buildings owned by

the same person were deemed to be four separate consumers, this Court quoting, at page 598, from the Commission's order:

" 'Neither the fact that there are several buildings on the plot receiving separate services, nor the fact that the sole owner of these buildings would be the contracting party for water service rendered thereto, are the factors upon which to determine this complainant's grievance. *The real point at issue is whether the complainant is a single Commercial-Industrial consumer receiving water for the purposes of one business unit, or whether the thirty-four tenants are each essentially separate domestic and/or commercial consumers.* Under the evidence the conclusion is inescapable that the latter is the fact.' " (Emphasis added.)

Under the evidence in the instant case the opposite conclusion, equally inescapable, is that the coincidence of uniform ownership with uniform use of the premises, places Colonial in the category of a single commercial consumer under the Water Company's Tariff Rule 17.

The order is affirmed.