Harrisburg Steel Corporation, Appellant, *v.*
Pennsylvania Public Utility Commission (et
al., Appellant).

Argued March 23, 1954. Before HIRT, ROSS, GUNTHER, WRIGHT and ERVIN, JJ. (RHODES, P. J. and WOODSIDE, J., absent).

*Roberts R. Appel* and *Homer Kripke,* with them *Herbert S. Levy* and *Appel, Ranck Levy & Appel,* for appellants.

*Earl V. Compton,* with him *William D. Boswell* and *Compton, Handler & Berman,* for appellants.

*G. Thomas Miller,* with him *J. Paul Rupp, Storey, Bailey & Rupp, Carl Rice* and *Witmer & Rice,* for appellant.

*Frank B. Ingersoll,* with him *Emory R. Kyle* and *Smith, Buchanan, Ingersoll, Rodewald & Eckert,* for appellant.

*Charles E. Thomas,* with him *John C. Kelley, Hull, Leiby & Metzger, Austin Gavin* and *Jack K. Busby,* for Pennsylvania Power & Light Company, appellant.

*W. Russel Hoerner,* Assistant Counsel, and *Lloyd S. Benjamin,* Counsel, for Pennsylvania Public Utility Commission.

OPINION BY HIRT, J., August 30, 1954:

On September 12, 1951, Pennsylvania Power and Light Company (hereinafter referred to as the Company) filed supplements to its existing tariffs with Pennsylvania Public Utility Commission. The various supplements contemplated increases in tariffs applicable to 2,435 large commercial, industrial and re-

sale customers, only. More than 500,000 other customers of the Company were not affected. Complaints were filed by the present appellants and by many others, which were consolidated for hearing with an investigation, instituted by the Commission of its own motion to determine whether the proposed new rates were fair, just and not unreasonably discriminatory. Pending disposition of the consolidated proceeding, the operation of the proposed tariffs was suspended by successive orders, to August 12, 1952. In its decision and order dated July 30, 1952, the Commission allowed a return of not more than 5.82% on $310,000,000 which it found to be the fair value of the Company's property for rate making purposes as of October 31, 1951. These determinations as well as specific amounts allowed as operating expense are not involved in the present appeals.

Three questions are raised: (1) May the Company recoup from the rate payers by a process of amortization an amount in excess of $25,000,000 paid by the company, on the purchase of various utility companies, over and above the total of their depreciated original cost? (2) Having failed, over a period of years, to make an adequate allowance for annual depreciation, may the Company recover a resulting deficiency in its depreciation reserve, by means of additional annual charges to operation expense? (3) Are the large commercial and industrial customers of the Company in Lancaster entitled to a continuation of an advantage in rates over other customers of the same class located elsewhere?

Pennsylvania Power and Light Company was formed by the merger of eight utility companies and was incorporated on June 4, 1920 under the laws of this State. During the following ten years the Company acquired by purchase many other utility com-

panies which were merged into its system for the sup-
ply of electric energy throughout the eastern section
of central Pennsylvania. The problem which gave rise
to the first question here involved, had its origin in
the promulgation of a uniform accounting system for
public utilities by the Federal Power Commission in
1936. A like system of accounting was adopted by
Pennsylvania Public Service Commission which, on
January 1, 1937, directed all electric utilities to main-
tain their books on an original cost basis in accord with
the uniform accounting provisions. We are concerned
primarily with account 100.5 in the uniform system
entitled Electric Plant Acquisition Clause. In this ac-
count the Company was required to include "the dif-
ference between (a) the cost to the accounting utility
of electric plant acquired as an operating unit or sys-
tem by purchase, merger, consolidation, liquidation,
or otherwise, and (b) the original cost, estimated if
not known, of such property, less the amount or
amounts which may be credited to the depreciation and
amortization reserves of the accounting utility at the
time of acquisition with respect to such property." In
this case the account was intended to disclose the
amount in excess of depreciated original cost which
was paid by the Company for the utilities purchased
by it. On December 19, 1944 the Commission in an
accounting proceeding initiated by it found that $25,-
930,121.01 was classifiable in account 100.5 under Elec-
tric Plant Acquisition Adjustments. The Federal
Power Commission had previously classified the same
amount in the same fashion. And both Commissions
ordered that the amount be written off the books of
the Company by amortization over a 15-year period at
the rate of $1,746,150 per year. There was a vital dif-
ference, however, in the two orders: The Federal Power
Commission directed that the amount be written off

by charges to "Miscellaneous Amortization" as a *disposition of income;* the Pennsylvania Commission directed the amortization by charges as *operation expense.* And in the instant proceeding the Commission made final its tentative order of December 19, 1944 and thus put the burden on the present rate payers of providing $1,746,150 annually over a fifteen-year period in addition to a return of a maximum of 5.82% on fair value of $310,000,000 in accordance with the findings of the Commission. We are agreed that there is palpable error in the order in this respect.

The question is of first impression not only in Pennsylvania but in other jurisdictions generally. It is a question of far-reaching importance. We may well believe that the amounts in the Acquisition Adjustment Accounts of other utility companies resulting from similar purchases may amount to hundreds of millions of dollars. And in the present case if the Company, more than 20 years after the purchases were made, may collect from the present rate payers the excess costs appearing in its account 100.5, there is no apparent obstacle to the similar recoupment by other utilities of like payments. Fundamentally, the error in this phase of the appeals arises from the fact that the Company with the aid of the Commission has transformed an administrative procedure, which it was bound to observe, into substantive law (albeit foreign to the processes of rate making) imposing new burdens on the rate payers. This conclusion is clearly indicated by the present record. In referring to the classification of the excess amounts paid for utilities over their original cost, and their amortization by charges to operating expense by our Commission and by charges to gross income by the Federal Power Commission, the 1944 order recites that "both this order and the Federal Power Commission order are for ac-

counting purposes only." And although the Commission elsewhere stated that the classification of the amount in account 100.5 was "not a controlling factor in rate adjudication" yet in the present case the Commission treated its amortization as an expense for rate purposes to be borne by the rate payers in addition to a fair return on the rate base. In so doing it is clear that the Commission has projected its accounting determination into the field of rate regulation and it should be noted that the burden imposed on the rate payers by the present order is much greater than the annual amortization payment itself. The payment is not deductible for tax purposes and it is probable that in order to produce a net of $1,746,000 after taxes, the rate payers would have to pay more than twice that amount annually. This is the equivalent of a further increase in the rate base. In *Lindheimer v. Illinois Bell Telephone Co.*, 292 U. S. 151, 164, 54 S. Ct. 658, it is said: "Charges to operating expenses may be as important as valuations of property. Thus, excessive charges of $1,500,000 to operating expenses would be the equivalent of 6 per cent. on $25,000,000 in a rate base." In the present case the annual charge involved is much more than $1,500,000.

The amount paid by the Company in acquiring the utilities, even if it be assumed that the transactions were at arms length, cannot be adopted as original cost for rate making purposes. Original cost is such cost "when first devoted to public service" (§502 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1212) and cannot be construed to mean a larger amount which a new owner is obliged to pay on purchase of the property of a utility. *Scranton-Spring Brk. W. Serv. v. Pa. P. U. C.*, 165 Pa. Superior Ct. 286, 67 A. 2d 735. But while the total amount paid by the Company did not enter into original cost

as an element of fair value, yet the Company did receive some value, for the excess payments, which is reflected in the rate base. From the testimony of A. D. Root, Vice President of the Company, at the hearings before the Commission it is clear that the Company bought the properties for the best prices for which it could get them. His testimony in effect was that while original and reproduction costs were not considered, yet the purchases were based on the physical aspects of the property and on the economic prospects of the area as well.[1] What the Company bought with the excess paid above original costs were intangibles and the Commission in effect so found. As present "going concern value" or increased earning power the intangibles were properly considered by the Commission in determining the fair value of the entire property as a rate base; the expectation of increased earnings was not unreasonable in the light of the potential operating efficiency of a large integrated plant.

At most the amount classified in account 100.5 represents "strategic or pre-emptive value" beyond original costs paid by the Company, in anticipation of increased earning power. Insofar as that expectation has not been realized the improvidence of the expenditures was that of the stockholders and cannot be

[1] He testified: "The Company bought properties for the best price they could get them for, and in determining whether or not it was desirable to pay that price studies were made as to the kind of territory in which the property was located, an examination was made of the property, the economic prospects of the area were determined and all those things having been taken into consideration the company decided it was willing to pay a price or not to pay a price . . . I do not ever recall that any examination was made as to the cost levels at the date the property was constructed and compared with the cost levels at the date the property was purchased and the difference taken into consideration in paying the purchase price. It was not done that way at all."

charged to operating expense. In any view, except to the extent that the intangible values contribute to the fair value of the whole, the rate payers cannot be compelled to pay a return on the investment, much less restore to the company the excessive price paid, through the device of amortizing the cost as an operating expense. Intangible values of this type do not depreciate or wear out; the Company still has them, although earnings may fluctuate. There is no good reason why the amount paid for these intangible values may not remain permanently on the books of the Company. And if the excess payments are to be amortized the method adopted by the Federal Power Commission is the proper one; as an accounting measure the excess is logically chargeable to the stockholders against gross income and not to the rate payers as operating expense.

As background of the second question, supra, the Commission stated: "In September 1951 respondent completed a depreciation study indicating that the book reserve at June 30, 1951, was $9,711,287 less than the depreciation reserve requirement at that date . . . Accordingly, in September 1951 subject to regulatory approval, respondent transferred $5,000,000 from surplus to depreciation reserve and proposes to amortize the balance of $4,711,287 over the estimated remaining average service life of the plant . . ." From the results of that study the Commission found that the remaining life of the Company's depreciable plant was 39.06 years. And in determining the original cost of the company's property recoverable through annual charges for depreciation, the Commission adopted 2.51 percent as the annual rate over remaining life to be applied to the deficiency of $4,711,287. The Commission in its order allowed the sum of $5,768,775 for annual depreciation. Included in this sum was an annual allowance of $118,-

250 to amortize, over 39.06 years, the above deficiency of $4,711,287 in the reserve account. The Commission thus within the sphere of its authority, accepted the Company's estimate of accrued depreciation. Cf. *City of Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607. The amount of $118,250, included in over 65 millions of dollars of the Company's total annual expense for rate purposes allowed by the Commission, will have no appreciable effect on the rates. We are agreed that the present order, in the above respect, was proper under the circumstances without reference, however, to the rule of de minimis. The case presents more than an attempt "to regulate the unregulated past."

There are inherent practical difficulties in the problem of measuring annual depreciation of the property of a public utility with accuracy, or of forecasting precisely the rate at which the property will depreciate in the future. Depreciation cannot be determined with mathematical precision; the result, of necessity, must be a judgment figure. *Pittsburgh v. Pa. P. U. C.*, 174 Pa. Superior Ct. 363, 101 A. 2d 761; *Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 90 A. 2d 607; *Pittsburgh v. Pa. P. U. C.*, 168 Pa. Superior Ct. 95, 108, 78 A. 2d 35. The very elements which enter into estimates of depreciation are not constant. Measuring the rate of consumption of capital over service life by wear and tear alone, is not a complete answer. Functional causes such as inadequacy or obsolescence are involved. Inadequacy may retire property prematurely because of the load requirement of increased demands. And obsolescence, for example, may be accelerated by unforeseeable developments for efficiency in the art of mechanics of production. Padding of estimates of annual depreciation on the books of a utility to meet such contingencies or to compensate for possible errors in

judgment, by annual depreciation allowances over the service life of the property is not to be encouraged. A public utility is entitled under the law to recover from the rate payers the original cost of its depreciable plant. Depreciation is an operating expense and represents the consumption of assets in rendering service. Errors of judgment in estimating depreciation in any one year or over a period of years however do not in themselves bar the utility from recovering any actual deficiency from the rate payers in later years.

In the present case the stockholders assumed the responsibility for the deficiency in the depreciation reserve to the extent of $5,000,000. In our view the remainder life theory was properly applied, under the circumstances, in amortizing the balance of the deficiency at the expense of the present rate payers, after the transfer of the above amount from surplus to depreciation reserve.

The Commission also properly disposed of the third question involved in this appeal by directing the Company to eliminate five so-called "B schedules" from its tariff as filed. These B rates were applicable to 223 large commercial and industrial consumers in certain political subdivisions of Lancaster County. The charges under these rates were 2.1 mills per KWH or approximately 11% lower than the standard rates available elsewhere to similar large users throughout the Company's service area.

The historical background of these rates, in their origin and uninterrupted operation over a period of years, is stressed by the Company and by appellant consumers as reason for their continuance. Prior to the acquisition of the Lancaster territory by the Company in 1930 the area had been served principally by Edison Electric Company which purchased its power requirements from a waterpower company referred to

as Penn Water. At the time of acquisition of the utilities in Lancaster the power from the above source was in no way connected with the system of Pennsylvania Power and Light Company. But the Company to continue the existing service, entered into a new contract with Penn Water under which the Company's power requirements for the Lancaster area were supplied. Under the favorable terms of the contract, water power was a cheaper source of energy than was available to the company elsewhere in its system. For this reason the Company, pursuant to its then established policy, continued the existing low rates then enjoyed by industrial consumers which later became the basis for the non-standard B rates incorporated into the Company's tariffs which were applicable to the Lancaster area alone. As late as 1948 these preferential rates had Commission approval. As to these lower rates the Commission stated: "The unique conditions which made the Lancaster area a unit wholly apart from the rest of Pennsylvania Power and Light Company's system and supplied independently of Pennsylvania Power and Light Company justified, in the past, treating that area as a distinct service area, the costs and rates of which were susceptible to separate treatment." In the tariffs involved in the present proceeding the Company once more sought to continue the differential of the B rates, between Lancaster and all other areas. The Commission however found that the preferential rates now have resulted in unreasonable preference and are unjustly discriminatory and on that ground directed their cancellation on the authority of §304 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1144.

The conditions which justified the B rates in the past no longer exist. The Company has constructed an extensive high voltage transmission network which

interconnect *all* service areas with *all* power sources of the Company. Not only are the Company's own generating plants tied together but the transmission network is connected with other utilities so that Company-generated power and power purchased from every source of supply, including Penn Water at Lancaster, are commingled in the system for the supply of every consumption area in the system. The result is an integrated power system operating as one unit. The Lancaster area is now a part of the Company's system and its customers there are on the same footing with consumers elsewhere. The power purchased from Penn Water no longer serves the Lancaster area exclusively. Power from that source, on entering the "power pool" of the integrated Company system loses its identity and becomes a part of the commingled energy from every source used in the service of all customers. There are advantages in the pooling of the Company's power. A single area is no longer dependent upon any one source of supply; the possibility of interruptions in service therefore is much more remote. In making the maximum use of the low cost power, wherever obtainable, the Company is in position to render more economical service which should operate to the ultimate advantage of all of its customers in every service area. Under the law the interests of the public as a whole throughout the system are the concern of the Commission.

Section 304 of the Public Utility Law in part provides: "No public utility shall establish or maintain any unreasonable difference as to rates, *either as between localities* or as between classes of service." Whether a difference in rates between classes of consumers or "between localities" amounts to unjust discrimination is an administrative question for the Commission. *Reading Coach Co. v. P. S. C.*, 125 Pa. Su-

perior Ct. 493, 500, 190 A. 172. The order as to the B rates is not clearly unreasonable nor unlawful and in any view the Commission in making it cannot be charged with an abuse of discretion. *Philadelphia Sub. Water Co. v. Pa. P. U. C.*, 164 Pa. Superior Ct. 320, 64 A. 2d 500.

Moreover, we are unable to agree that there was a failure of administrative due process, as contended by one of the appellants, in the elimination of the B rates by the Commission without notice to the affected industrial users in Lancaster.

The consolidated proceeding is remanded to the Commission for an order consistent herewith.

RHODES, P.J., and WOODSIDE, J., did not participate in the consideration or determination of this case.

---

OPINION BY GUNTHER, J., DISSENTING IN PART AND CONCURRING IN PART:

Pennsylvania Power & Light Company (hereinafter called Company) filed with the Public Utility Commission a proposed tariff for increased rates in September, 1951. After hearings, the Commission issued an order July 30, 1952, authorizing rate increases totalling over $3,000,000. Several of Company's industrial consumers have appealed from the Commission's order, alleging error in the allowance as deductions of certain amortizations and in the readjustment of certain rates.

1. *Amortization of Acquisition Costs.* At various times in the last thirty years Company has acquired the property of other, smaller utilities, by merger or purchase. The cost of these acquisitions was formerly recorded in an unsegregated fashion, but in 1937 the Commission directed the use of a uniform system of accounts. This system required the segregation of the costs of utilities acquired by merger or purchase into

one account for the original cost when first devoted to public service and another account for the difference between original cost and acquisition cost. The latter is called account 100.5, Electric Plant Acquisition Adjustments. The validity of this accounting system was upheld by this Court in *Scranton-Spring Brook Water Service Co. v. Pa. P. U. C.,* 165 Pa. Super. Ct. 286, 67 A. 2d 735. In 1944 the Commission ordered the classification of approximately $26,000,000 to Company's account 100.5. The present order permits the Company to deduct as an operating expense about $1,-700,000 annually for amortization of the accounts in account 100.5. It is this amortization allowance which is now being attacked.

It is clear that this order does nothing more than to permit the Company to depreciate on the basis of the actual cost of acquisition. The appellants contend that this makes the allowance of expenses and the cost of service dependent on the fortuitous occurrence of a sale or transfer of the utility property, in the absence of which there would be allowed only the annual depreciation based on original cost. This argument overlooks the fact that the sales or transfers were in the public interest and resulted in benefits properly paid for by the consumers. Each transfer or merger must be approved by the Commission. It is not alleged that any of Company's prior acquisitions were not in the public interest nor the result of anything but bona fide arms-length transactions. Elementary principles of equity and justice require the allowance of amortization of depreciable investment, the cost of which has not been challenged here. The Company's acquisitions were much more than mere fortuitous occurrences, but were approved by the Commission as of benefit to the public, on whom should properly fall the costs of such benefits. .

It is also contended that the courts have held that annual depreciation must be based solely on original or historical cost. The book cost in this case would be the costs of acquisition of various other utilities, which costs were previously determined to be fair and reasonable. Since the present system of accounting permits depreciation on original cost only, the amortization of the excess between original cost and cost of acquisition is necessary, in order to depreciate the entire book cost and thereby insure the return of the actual capital outlay.

2. *Amortization of Depreciation Deficiency.* A recent study of actual depreciation by the Company showed that the accrued depreciation accounted for in past years did not equal the actual depreciation of the property by some $9,700,000. The Company proposed, and the Commission so ordered, that this past deficiency be made up by having the shareholders absorb $5,000,000 thereof, and by having the remainder amortized over the remaining life of the property. This results in an addition to annual depreciation of $118,000.

The principle of this authorization is called the remainder-life theory and has since been abandoned by the Commission for various reasons. The allowance of amortization to recover such a deficiency was, however, approved by the Court in *Pittsburgh v. Pa. P. U. C.,* 171 Pa. Superior Ct. 187, 90 A. 2d 607, where an order of the Commission authorizing a similar addition to annual depreciation was affirmed.

We agree with the Commission that the result of this allowance is de minimis for it will result in an increase in Company's rate of return from 5.82% to fair value to 5.86%. In view of the fact that the Commission's findings in any rate case on such matters as fair value and actual depreciation represent judgment values and not precise mathematical calculations, we feel

that this error, if such, falls within the area of the Commission's reasonable judgment as to actual figures.

3. *Lancaster B. Rates.* Both the Company and the other appellants have protested a third aspect of the order appealed from. For over twenty years the consumers in the Lancaster area have enjoyed preferential rates known as B rates, because at the time the Company acquired the utility property serving that area, there was no connection between that area and the remaining area served by Company. For many years the power supplying the Lancaster area was purchased from the Pa. Water & Power Co. at a low rate and this saving was passed on to Lancaster consumers. The Commission has now ordered that these lower rates be equalized because, it was found, all of Company's consumers are now served by a wholly integrated system and the Lancaster area is no longer supplied exclusively from the cheaper power source. The continuance of preferential rates was therefore held to be unjustly discriminating and proscribed by §304 of the Public Utility Law, 66 PS 1144.

The reasonableness of classification and the different rates applicable are administrative questions, and if there is competent evidence to support the Commission's findings, the order must be affirmed. *Phila. Suburban Water Co. v. Pa. P. U. C.,* 164 Pa. Superior Ct. 320, 64 A. 2d 500. A preferential rate must be unreasonable before it can be held discriminatory. The rules for unreasonableness were set forth in *Alpha Portland Cement Co. v. Public Service Comm.,* 84 Pa. Superior Ct. 255, and followed in subsequent cases. The rule is that a preferential rate is unlawful if it results in an advantage to one consumer and a resulting disadvantage to another, such as where consumers of the same class are charged different rates.

The record reveals that there was sufficient competent evidence to sustain the Commission's findings in this case. In recent years the Lancaster area has become connected to the rest of Company's system by the construction of several power lines. The result is that the power supplied from Lancaster enters a general power pool along with all of Company's other sources of power. Therefore, no consumer can trace any of his electricity to any specific power source. Although the amount of power purchased by Company from the cheaper Lancaster source is gauged by the approximate total required in the preferred area, that area is also served by the power and facilities of all the other areas in Company's domain. Appellants' arguments ignore the fact that the interconnection of Lancaster has resulted in benefits to that area in the form of a constantly guaranteed flow of power insuring against the breakdown of their hitherto sole power source. The integration therefore results in benefits to all consumers. There is also no reason why the saving of the cheaper Lancaster power should not be spread equally among all the consumers to whom it is available. There is, therefore, evidence to show that the reason for the preferential rates has passed, and the differences are now unreasonable and discriminatory.

Appellant Armstrong Cork Co. further contends that the elimination of the Lancaster B. rates was a violation of due process in that it received no notice of the hearing on that question. Such an argument presupposes that a consumer has a substantive right to a preferential rate. Also, there is no requirement in the Public Utility Law that every consumer be given notice by the Commission of a proposed hearing.