## Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued November 13, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*David Stahl,* Assistant City Solicitor, with him *J. Frank McKenna, Jr.,* City Solicitor, for appellant.

*Morris Mindlin,* Assistant Counsel, with him *Thomas M. Kerrigan,* Acting Counsel, for Public Utility Commission, appellee.

*Ernest R. von Starck,* with him *Robert H. Young* and *Joseph A. Beck,* for water company, intervening appellee.

OPINION BY GUNTHER, J., January 21, 1958:

The City of Pittsburgh (hereinafter referred to as the "City") has taken this appeal from an order of the Pennsylvania Public Utility Commission (hereinafter referred to as the "Commission") dated January 7,

1957 prescribing changes in the contractual formula rate for City customers served by South Pittsburgh Water Company (hereinafter referred to as "Company.")

The Company supplies water in the suburban Pittsburgh area of Allegheny County lying south of the Monongahela River in twenty-two boroughs and eight townships in addition to nine wards of the City which have been annexed from time to time. Since 1919, the Company has supplied water within the City under various contracts whereby it sold to the City all water used by residents of the various wards served by the Company. It owns the facilities for providing this service, including all distribution mains, meters, and services in all of the areas. The most recent contract between the Company and the City was entered into on July 16, 1941, in which the City was treated as a single customer and the formula for determining the rate to be charged within the City included (a) the regular meter charge for all water supplied, computed by applying the Company's regular meter quantity rate; (b) a public fire service charge; (c) a guaranteed annual return of six percent on the value of the Company's distribution facilities within the City, the property valuation being fixed as determined in the contract; (d) a special annual depreciation allowance on the property valuation; (e) a charge for unaccounted water; (f) reimbursement to the Company for its annual expenses of operation and maintenance of the distribution facilities within the City; and (g) the annual cost of preparing statements showing the metered consumption of water for each customer within the City.[1]

---

[1] The prior contracts in effect from 1919 to 1941 were incorporated into the record by reference, and each of these contracts

Under this agreement, the City billed its residents at its own rates by separate billings and without regard to the charges paid by it to the Company, but the City gained a discount or rate differential of 17.6% over that billed by the Company to its other individual customers. The agreement provided for the right of either party to terminate the agreement, subsequent to March 31, 1951, upon not less than ninety days' notice in writing served upon the other party and fixing the date of such termination. It further provided that "Nothing in this agreement shall be construed to interfere with, waive or in any manner abridge . . . any of the rights, powers or privileges now or at any future time held or enjoyed by either of the parties hereto, or to operate thereafter to the prejudice of any claims of either of the parties hereto, but all such rights, powers and privileges and claims, whether held now or hereafter acquired by contract or otherwise, . . . shall in no wise be affected, or concluded, or prejudiced by this agreement."

By letter dated November 29, 1954, the Company gave notice to the City of its intention to terminate the agreement as of March 31, 1955. Concurrently, it filed Supplement No. 6 to Tariff No. 11, which provided a new form of contract under which the City could elect to continue paying for all of the water used by its residents and serviced by the Company but under which the City would receive a discount of only four percent. The four percent discount consisted of a 1¾% allowance for prompt payment and a 2¼% allowance for billing and collecting by the City. Supplement No. 6 to Tariff No. 11 was originally scheduled

required the City to pay the aggregate of the charges to each of the Company's customers within the City less a discount of five percent.

to become effective February 1, 1955, but by orders dated January 24 and July 25, 1955, the Commission suspended the proposed tariff for a total period of nine months. On October 10, 1955, the Commission issued a temporary rate order continuing the existing contract rate until further order. By order dated January 7, 1957, the Commission approved the new form of contract for the City but found that the Company's total system revenues would be too high if it operated under that contract for service in the City. It therefore directed the Company to file Supplement No. 10 to Tariff No. 11, effective February 1, 1957, containing the form of contract prescribed by Supplement No. 6 but also containing reductions in the schedule of meter rates set forth in Tariff No. 11 itself. The rates prescribed by the Commission were designed to produce a rate of return of 5.6% on a fair value of $33,-000,000. The Commission rejected the City's contention that it was entitled to lower rates than outside consumers, except for the four percent discount herein referred to.

At the hearings before the Commission, the City contended that the nine wards within the City served by the Company should be considered as a separate rate area and in support thereof made an extensive cost of service study. It urged that the termination of the agreement heretofore referred to and the adoption of a uniform system-wide rate to the City area would be discriminatory against the City consumers. The Commission rejected this contention. In addition, the City contended that the Commission should use accrued depreciation developed by the straight line method instead of the four percent compound interest method in determining the various elements of value. The Commission affirmed the use of the latter method.

In challenging the Commission's adjudication on both grounds, the City has taken this appeal.

On this appeal the City frankly concedes that the rate for water to its consumers has long been lower than the general rates of the Company to its other consumers. It contends, however, that by reason of the concentration of the consumers in a relatively limited area as compared to the expanded total area of the Company's customers, that by reason of the alleged lower cost to the Company in providing service within the City, it should be treated rate-wise as a separate rate area within the overall system of the Company. The error of this assumption, however, lies in the fact that, by the same reasoning, any other municipality served by the Company could make the same assertion in asking for preferential treatment so as to completely disrupt the rate regulation of this integrated utility company. The City concedes that there are other areas outside the City wards which have the same characteristics but concludes that this is not its problem. While such a conclusion may be correct so far as the City is concerned, it does not follow that the problem ceases to exist. It becomes the problem of the Commission. Were it to grant a preference to one group because of relative proximity and density, the Commission would have to grant the same preference to other groups similarly situated. Relative costs between areas alone is not controlling. We do not infer that this may not be considered under certain circumstances where, for example, separate rate classes of service or rate areas exist, where such a unit is marked by population, economic, social and topographical characteristics peculiar to itself. See: *American Aniline Products, Inc. v. Lock Haven,* 288 Pa. 420, 135 A. 726; *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission,* 135 Pa. Superior Ct. 5, 4 A. 2d 622. If

area classifications were determined by cost of service studies, such could produce an infinite number of rate zones, and in the instant case, such assumption alone could create rate zones within the city area served depending on proximity to the source of supply of water.

The Commission found on persuasive evidence, however, that the water system here involved is completely integrated. It was constructed without regard to city lines. The corporate history of the Company and its growth · show that none · of its charter territory was originally located inside the City. The nine wards now within the City became such by reason of annexations which have occurred since the Company's principal transmission system had been designed and installed. Major facilities are bisected by City lines, transmission as well as distribution lines pass in and out of the City, and most of the local storage pressure and fire flows in surrounding areas include both City territory and suburban territory. The feeder mains are all interconnected by the general distribution of smaller pipe which have been laid out to follow streets. Many instances were found where the distribution mains pass in and out of the City and even some individual service lines cross the City limits. The Commission further found, on adequate evidence, that the Company's sole source of water supply is the Monongahela River. Water is taken at Beck's Run Pumping Station, pumped uphill a distance of about two miles to Hays Mine Station where the water is treated, filtered and softened, and then is pumped directly into the main arteries of the Company's transmission and distribution system. This system consists of about 862 miles of pipe extending through all or parts of thirty different municipalities, including the City. In view of these facts showing no operating or physical differences in serving the City which, by themselves, would

give rise to a lesser cost for such service, what justification is there for treating the City as a separte rate area? The City contends that the rate in effect for the past fourteen years is proof itself and cannot be lightly brushed aside without adequate supporting evidence. However, a prior rate structure is not res judicata on the question of reasonableness or discrimination. *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826.

In *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 550, 562, 109 A. 2d 719, we said:

"Section 304 of the Public Utility Law in part provides: 'No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.' Whether a difference in rates between classes of consumers or 'between localities' amounts to unjust discrimination is an administrative question for the Commission. Reading Coach Co. v. P. S. C., 125 Pa. Superior Ct. 493, 500, 190 A. 172. The order as to the B rates is not clearly unreasonable nor unlawful and in any view the Commission in making it cannot be charged with an abuse of discretion. Philadelphia Sub. Water Co. v. Pa. P. U. C., 164 Pa. Superior Ct. 320, 64 A. 2d 500."

The determination of rate areas and rate classifications are administrative functions and should not be disturbed except for abuse of discretion or lack of evidence. The evidence sustains the view of the Commission and we find no abuse of discretion. *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 320, 64 A. 2d 500; *Brown v. Pennsylvania Public Utility Commission,* 152 Pa. Superior Ct. 58, 31 A. 2d 435.

The second contention of the City was previously raised and decided in *Pittsburgh v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 363, 101 A. 2d 761. The City's depreciation methods are essentially matters of opinion rather than of law. What we have said previously in this regard need not be again repeated. See also *Johnstown v. Pennsylvania Public Utility Commission*, 184 Pa. Superior Ct. 56, 72, 133 A. 2d 246.

The order of the Commission is affirmed.